Mickel M. Arias, Esq. (SBN 115385)
mike@aswtlawyers.com
Craig S. Momita, Esq. (SBN 163347)
craig@aswtlawyers.com
M. Anthony Jenkins, Esq. (SBN 171958)
anthony@aswtlawyers.com
**ARIAS SANGUINETTI WANG & TEAM LLP**
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Telephone: (310) 844-9696
Facsimile:  (310) 861-0168

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL JESSE GARCIA individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BANDAI NAMCO ENTERTAINMENT AMERICA, INC., <br><br> Defendant. | CASE NO. <br><br> CLASS ACTION COMPLAINT FOR: <br><br> JURY TRIAL DEMANDED |

Plaintiff Samuel Jesse Garcia ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.      Plaintiff brings this action against Defendant Bandai Namco Entertainment America Inc. ("Bandai Namco" or "Defendant") for repeated, systematic, and willful violations of the Video Privacy Protection Act, 18 U.S.C. §

**CLASS ACTION COMPLAINT**

ARIAS SANGUINETTI WANG & TEAM LLP

2710 (the "VPPA"). Defendant shares Personal Viewing Information—i.e., customers' unique Facebook ID (FID) and specific video game purchase information—together as one data point to Facebook. Because the customer's FID uniquely identifies an individual's Facebook user account, Facebook—or any other party with access to this data—can quickly and easily link this information to the customer's corresponding Facebook profile. Bandai Namco's actions represent a significant privacy breach, enabling Facebook to compile detailed profiles of individuals' video game purchasing habits for targeted advertising purposes, without users' knowledge or permission. Such disclosures of personally identifiable information have been found to state a viable claim under the VPPA. See *Jancik v. WebMD LLC*, No. 1:22-CV-644-TWT, 2025 WL 560705, at *6-10 (N.D. Ga. Feb. 20, 2025) (holding Meta Pixel's transmission of video viewing data with user identifiers violated the VPPA); *Salazar v. National Basketball Association*, 118 F.4th 533, 536 (2d Cir. 2024) (finding disclosure of video titles with Facebook IDs through Meta Pixel constituted VPPA violation); *Edwards v. MUBI, Inc*., No. 24-cv-00638-EKL, 2025 WL 985130, at *4-5 (N.D. Cal. Mar. 31, 2025) (ruling website tracking pixels sending video titles with user identifiers to Meta violated the VPPA). This action seeks redress for Defendant's violations of the VPPA on behalf of a nationwide class of consumers.

2.    In the digital age, personal privacy has become increasingly vulnerable to corporate exploitation, with tech companies and data brokers harvesting and monetizing consumers' most intimate preferences without transparency or meaningful consent. This case highlights a particularly egregious example of such exploitation: Defendant's surreptitious collection and disclosure of consumers' video game viewing and purchasing data to Facebook—one of the world's largest advertising networks—without obtaining the informed, written consent explicitly required by federal law. This deliberate disregard for consumer privacy rights allows

ARIAS SANGUINETTI WANG & TEAM LLP

Defendant to profit from the unauthorized commodification of consumers' personal information while depriving those same consumers of their statutory right to control how their sensitive data is used and shared.

3.    Through its implementation of the Facebook Pixel tracking technology on its website and online store, Defendant has systematically and knowingly disclosed Plaintiff's and Class members' personally identifiable information ("PII") to Facebook, enabling the social media giant to link specific video game preferences and purchases to individual Facebook users.

4.    This unauthorized disclosure of sensitive data directly contravenes the VPPA's plain language and core purpose of protecting individuals' privacy in their video-related activities. The VPPA was enacted precisely to prevent companies from revealing consumers' viewing preferences to third parties without explicit permission.

5.    Defendant's privacy violations are particularly troubling given the nature of video game content, which often reflects deeply personal interests, preferences, and values. Modern video games frequently contain sophisticated narratives, moral choices, and content addressing sensitive topics such as politics, religion, sexuality, and violence. The specific games a consumer purchases— whether they choose war simulations, fantasy role-playing adventures, child-friendly educational content, or games with mature themes—can reveal intimate details about their personality, moral compass, political leanings, and even psychological profile. The disclosure of such information to Facebook provides Facebook and its advertising partners with granular insights into consumers' personalities, interests, and behaviors that they never intended to share and enables psychological profiling far beyond what consumers might reasonably expect from a video game purchase.

6.    These privacy violations are especially concerning because a

significant portion of Defendant's customer base consists of minors and young adults who are particularly vulnerable to online tracking and data exploitation. Children and teenagers who play and purchase video games are often unaware of sophisticated tracking technologies and unable to provide meaningful informed consent to data collection. Defendant's practices effectively exploit this vulnerability, collecting and sharing sensitive data from young consumers who lack the knowledge, experience, and legal capacity to protect their own privacy interests.

## PARTIES

7.    Plaintiff Samuel Jesse Garcia is an individual who is over 18 years old and a citizen of the State of California. Mr. Garcia is a subscriber of Defendant's Website who has viewed and purchased video games on the Website while logged into his Facebook account.

8.    Defendant Bandai Namco Entertainment America Inc. is a Delaware corporation with its principal place of business at 23 Odyssey, Irvine, California 92618. Bandai Namco is a subsidiary of Bandai Namco Holdings Inc., a Japanese multinational video game publisher and developer with global operations.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, namely the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.    This Court has personal jurisdiction over Defendant because it maintains its principal place of business in California, regularly conducts business in California, and the unlawful conduct alleged in this Complaint occurred in, was directed from, and/or emanated from California.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, Defendant resides in this District, and Defendant's principal place of business is

ARIAS SANGUINETTI WANG & TEAM LLP

located within this District.

## **GENERAL ALLEGATIONS**

**A.    Background of the Video Privacy Protection Act**

12.    The Video Privacy Protection Act was enacted in 1988 following the controversial disclosure of Supreme Court nominee Robert Bork's video rental records during his confirmation hearings. Congress recognized the profound privacy implications of revealing an individual's video viewing habits and acted decisively to protect this sensitive information.

13.    The VPPA generally prohibits "video tape service providers" from knowingly disclosing consumers' personally identifiable information without their "informed, written consent" given "at the time the disclosure is sought" in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B).

14.    Prior to the VPPA's enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 6-7 (1988).

15.    Senators were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988).

16.    In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy emphasized that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own

ARIAS SANGUINETTI WANG & TEAM LLP

homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

17.    The personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

18.    While these statements rang true in 1988 when the VPPA was passed, the importance of such legislation in the modern era of data mining from online activities is even more pronounced. During a Senate Judiciary Committee meeting titled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

19.    Courts have consistently recognized that the VPPA applies to modern digital services that provide video content, not just traditional brick-and-mortar video rental stores. See, e.g., *Salazar v. National Basketball Association*, 118 F.4th 533, 553 (2d Cir. 2024) (holding that 'the VPPA is no "dinosaur statute" and its "privacy protections remain as robust today as they were in 1988")

**B**.    **Facebook Pixel Technology and Its Tracking Capabilities**

20.    The Facebook Pixel is a snippet of JavaScript code that website owners can integrate into their websites to track visitor activity. When implemented, the Pixel establishes a direct connection between a website and Facebook's servers,

ARIAS SANGUINETTI WANG & TEAM LLP

---

[1] See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Subcommittee on Privacy, Technology and the Law, https://www.judiciary.senate.gov/imo/media/doc/CHRG-112shrg87342.pdf.

**CLASS ACTION COMPLAINT**

enabling the real-time transmission of user data.

21.    The Facebook Pixel works by placing cookies in users' browsers that contain unique identifiers. These cookies—particularly the "c_user" and "fr" cookies—allow Facebook to match website activity to specific Facebook user accounts.

22.    The "c_user" cookie contains a user's unencrypted Facebook ID ("FID"), while the "fr" cookie includes an encrypted Facebook ID and browser identifier. Together, these cookies enable Facebook to track users across sessions, devices, and websites, creating comprehensive profiles of individual browsing and purchasing behavior.

23.    When a Facebook user visits a website with the Facebook Pixel implemented, the Pixel automatically transmits data about the user's activity to Facebook, including page views, clicks, purchases, and other interactions. This data is tied directly to the user's Facebook identity through the cookies described above.

24.    Facebook's own documentation encourages businesses to implement the Pixel to "see when customers took an action after seeing your ad…. Which can help with retargeting."[2] This targeting capability explicitly relies on matching website activities to specific Facebook users.

25.    Unlike anonymous or aggregated analytics tools, the Facebook Pixel is designed specifically to identify individual users and track their personal activities across the web, creating detailed behavioral profiles that can be used for targeted advertising.

**C.    Bandai Namco's Use of the Facebook Pixel Discloses PII to Facebook Without Customer Consent**

26.    Bandai Namco Entertainment America Inc. is a leading video game publisher and distributor with annual revenues of $7.17 billion as of fiscal year 2023.

---

[2] Meta, Meta Pixel, https://www.facebook.com/business/tools/meta-pixel (last visited Apr. 21, 2025).

**CLASS ACTION COMPLAINT**

The company is responsible for developing, publishing, and marketing numerous internationally acclaimed gaming franchises including Dark Souls, Elden Ring, Tekken, Dragon Ball, Pac-Man, Ace Combat, Tales, and hundreds of other titles spanning multiple genres and platforms. As one of the industry's largest publishers, Defendant maintains extensive digital distribution channels, with its websites www.bandainamcoent.com and store.bandainamcoent.com serving millions of American consumers annually. Defendant's substantial market presence and vast customer base make its privacy violations particularly far-reaching and damaging to consumer interests nationwide.

27.    Upon information and belief, Defendant implemented the Facebook Pixel on both its main website and online store and continuously operated the tracking technology for a significant period of time.

28.    Bandai Namco's implementation of the Facebook Pixel results in comprehensive tracking of user activities, from initial site visit to purchase completion on both www.bandainamcoent.com and store.bandainamcoent.com. This tracking encompasses all user actions, including page views, product considerations, and purchases.

29.    The collected data includes detailed event information logged by the Facebook Pixel such as PageView, ViewCategory, ViewContent, AddToCart, InitiateCheckout, and PlaceOrder. Each event transmission includes highly specific shopping data such as URLs of pages visited, product IDs, names of video games viewed, buttons clicked, prices, and currencies.

30.    For Facebook users, this tracking is not anonymous; it is directly linked to their Facebook profiles through specific cookies, including c_user and fr. The c_user cookie contains the user's unencrypted Facebook ID ("FID"). The fr cookie includes an encrypted Facebook ID and browser identifier, enabling cross-session and cross-device tracking. Together, these tracking capabilities allow Bandai Namco

ARIAS SANGUINETTI WANG & TEAM LLP

to correlate specific user activities and events to specific Facebook profiles.

31.     Importantly, FIDs are uniquely associated with particular Facebook accounts. A Facebook profile can be identified and viewed by simply appending an FID to the end of "Facebook.com". This means that anyone with access to a user's FID can easily identify and view the associated Facebook profile, thereby linking the gaming activity and purchases on Bandai Namco's website directly to a specific, identifiable individual.

32.     This level of identification goes beyond mere data collection; it allows for the precise matching of video game preferences and purchases to individual Facebook users, potentially exposing sensitive information about a person's interests and spending habits without their explicit consent.

33.     For example, when a logged-in Facebook user views the "Dark Souls III Standard Edition – STEAM" on Bandai Namco's website, Bandai Namco discloses PageView and ViewContent events to Facebook. These events are sent alongside the user's c_user and fr cookies, revealing to Facebook that this specific individual (and corresponding FID) has viewed this exact game edition, including the fact that it's for the STEAM platform and is priced at $39.99.

34.     Similarly, if a user browses the "DRAGON BALL: The Breakers – PS4 Limited Edition Bundle", Bandai Namco again discloses PageView and ViewContent events to Facebook. This transmission informs Facebook that the user is looking at this specific game bundle for PS4, priced at $19.99. (See Figures 1 and 2, illustrating the data collected and transmitted during these ViewContent events.)

///

///

///

**CLASS ACTION COMPLAINT**

***Figures 1 and 2: Data Collected During a ViewContent Event for Video Game Views on Bandai Namco's Website***

**CLASS ACTION COMPLAINT**

ARIAS SANGUINETTI WANG & TEAM LLP

35.     In both cases, Bandai Namco secretly discloses to Facebook precisely which games, editions, and platforms individual users are interested in, along with the exact price points. This level of detail allows Facebook to build a comprehensive profile of the user's gaming interests and purchasing habits, all without the user's explicit consent as required by the VPPA.

36.     The personal viewing information collected and shared by Bandai Namco is particularly sensitive given the nature of many video games the company publishes. Bandai Namco's catalog includes games with mature themes, violence, and other content that reveals highly personal information about consumers' preferences, interests, and beliefs. By sharing this information with Facebook, Defendant enables the creation of intrusive psychological profiles that extend far beyond mere entertainment preferences.

37.     The Facebook Pixel can continue tracking users across browsing sessions even after they log out of Facebook, meaning that Defendant's privacy violations may extend beyond active Facebook sessions. The persistent nature of these tracking cookies means that user information continues to be collected and associated with identifiable profiles long after consumers believe their browsing session has ended.

38.     Defendant strategically leverages the enhanced user profiles created through its Facebook Pixel integration to build highly targeted advertising campaigns that generate substantial additional revenue. This sophisticated data-sharing arrangement creates a lucrative revenue stream for Defendant in several ways: (1) it enables Defendant to retarget consumers who have viewed specific products with tailored advertisements across Facebook's platforms; (2) it allows Defendant to create "lookalike audiences" to identify and target new potential customers with similar characteristics to existing high-value customers; and (3) it provides Defendant with competitive marketplace advantages through privileged

access to granular consumer behavior analytics. Without obtaining the legally required consent from its digital subscribers, Defendant has constructed an unlawful profit mechanism that monetizes consumer data in direct contravention of federal privacy law. Defendant reaps these secret profits at the expense of its digital subscribers' privacy and their statutory rights under the VPPA. This exploitation of consumer data represents not just a legal violation but a fundamental breach of consumer trust and autonomy.

39.    Upon information and belief, Defendant receives valuable consideration from Facebook in exchange for implementing the Facebook Pixel and sharing user data. This consideration includes enhanced advertising capabilities, detailed analytics about website traffic, and the ability to retarget consumers with personalized advertisements across Facebook's platforms. This symbiotic relationship creates a strong financial incentive for Defendant to continue its unlawful sharing practices.

40.    Defendant does not seek its customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

41.    Defendant's privacy policy and terms of service fail to adequately disclose the extent of data sharing with Facebook. While the policy may contain general language about third-party cookies or analytics, it does not provide the specific, informed consent required by the VPPA for the sharing of video viewing information. The mere presence of a privacy policy that consumers are unlikely to read or understand does not constitute informed consent under the statute.

42.    In short, Bandai Namco shares Personal Viewing Information—i.e., customers' unique Facebook ID (FID) and specific video game purchase information—together as one data point to Facebook. Because the customer's FID

ARIAS SANGUINETTI WANG & TEAM LLP

uniquely identifies an individual's Facebook user account, Facebook—or any other party with access to this data—can quickly and easily link this information to the customer's corresponding Facebook profile.

43.    Bandai Namco's actions represent a significant privacy breach, enabling Facebook to compile detailed profiles of individuals' video game purchasing habits for targeted advertising purposes, without users' knowledge or permission. This not only infringes upon individual privacy rights but also undermines the core principles the VPPA was designed to protect.

44.    By enabling the creation of intricate user profiles for targeted advertising, Bandai Namco has effectively commodified personal video game preferences, violating both the letter and spirit of privacy law. These actions demand immediate scrutiny to safeguard consumer rights and uphold privacy protections in the digital entertainment landscape.

45.    Defendant's conduct is particularly egregious because its primary customer base includes a substantial percentage of minors and young adults who are statistically less likely to understand the technical implications of having their viewing habits tracked and shared with third parties. Video game consumers include significant numbers of Gen Z users (ages 11-26) as well as minors under the age of 18. These demographics are precisely the populations that research has shown are most vulnerable to privacy intrusions despite their digital nativity, due to lower awareness of sophisticated data collection practices and reduced likelihood of reading privacy policies. Defendant's games—including popular franchises like Dragon Ball, Pac-Man, and various anime-themed titles—are specifically marketed to and popular among younger audiences. These young consumers are entitled to heightened privacy protections under both the VPPA and general principles of consumer protection law, particularly given their reduced capacity to provide meaningful informed consent. Defendant's exploitation of this vulnerable consumer

demographic through sophisticated tracking technologies represents an especially troubling abuse of market power and technological advantage.

## D. Plaintiff's Experience

46. Plaintiff Samuel Jesse Garcia has been a Facebook user for many years. After his original account was hacked several years ago, he created a new Facebook account under his full name "Samuel Jesse Garcia," which he is perpetually logged into on his personal devices, including his laptop and smartphone.

47. Plaintiff has been playing Bandai Namco games for much of his life and is a long-time fan of their titles. Elden Ring is one of his favorite games, which led him to visit Bandai Namco's website.

48. Plaintiff visited Bandai Namco's website multiple times in the months leading up to June 2024 to research and view Elden Ring content. During these visits, he regularly accessed the website while logged into his Facebook account on the same device.

49. Each time Plaintiff initiated an event on Defendant's website (such as viewing a video game product page), the company simultaneously disclosed to Facebook via the Facebook Pixel: Plaintiff's Facebook ID and any logged data associated with the event, such as specific information about the game viewed.

50. On June 15, 2024, Plaintiff decided to pre-order the highly anticipated "ELDEN RING Shadow of the Erdtree Collector's Edition" for PlayStation 5 from Bandai Namco's online store for $289.35.

51. To complete this purchase, Plaintiff provided the company with his name, email address, shipping address, and payment information, which was processed through the Adyen payment system. Defendant assigned this purchase order number #471987. (See Figure 3, showing the order confirmation email from Bandai Namco to Plaintiff.)

//

ARIAS SANGUINETTI WANG & TEAM LLP



**Figure 3: Screenshot of Plaintiff's Order Status Email from Bandai Namco Entertainment America dated June 21, 2024**

52.    During the entire ELDEN RING purchase process—from initial product research, to cart addition, to checkout, to order completion—Defendant continuously shared Plaintiff's activities with Facebook, along with his unique Facebook identifier, providing Facebook with detailed information about his specific gaming preferences, spending habits, and purchase behaviors.

53.    This paired information personally identifies Plaintiff and the video game materials that he viewed, considered purchasing, and bought on Bandai Namco's website, all without Plaintiff's explicit consent as required by the VPPA.

54.    At no point during these or any other interactions with Defendant's website did Plaintiff receive a clear disclosure about the collection and sharing of his video game viewing and purchasing information with Facebook.

55. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

56. Defendant's disclosure of Plaintiff's PII was not related to an ordinary course of business (e.g., debt collection, order fulfillment, request processing, or any transfer of ownership).

57. As a result of Defendant's unlawful disclosures, Plaintiff has suffered harm in the form of invasion of privacy and statutory damages under the VPPA.

58. Courts have consistently held that the disclosure of private information is an "intangible harm" that satisfies Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 141 S.Ct. 2190 (2021). The VPPA specifically "identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017). "As a result, every 18 U.S.C. § 2710(b)(1) violation 'present[s] the precise harm and infringe[s] the same privacy interests Congress sought to protect' by enacting the VPPA." *Id*. at 984; see also *Edwards v. MUBI, Inc*., No. 24-cv-00638-EKL, 2025 WL 985130, at *3 (N.D. Cal. Mar. 31, 2025) (finding that allegations of unauthorized disclosure of video viewing information to Meta via the Meta Tracking Pixel "concern substantive privacy rights under the VPPA, and they are sufficient to establish Article III standing"). Plaintiff's allegations of harm are therefore sufficient to establish standing in this case.

## CLASS ALLEGATIONS

**A.    Definition of the Class**

59. Plaintiff brings this action individually and on behalf of all persons that

ARIAS SANGUINETTI WANG & TEAM LLP

ARIAS SANGUINETTI WANG & TEAM LLP

the Court may determine appropriate for class certification, pursuant to Fed. R. Civ. P. 23 (the "Class" or "Class Members"). Plaintiff seeks to represent a Class of persons preliminarily defined as:

> **All persons in the United States who have a Facebook account and have made a purchase on Bandai Namco's website (www.bandainamcoent.com) or Bandai Namco Store (store.bandainamcoent.com) while logged into their Facebook account.**

60.    Excluded from the Class are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

61.    This definition is subject to modification as discovery discloses further information. Plaintiff reserves the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.

62.    This case is properly maintainable as a class action pursuant to and in accordance with Fed. R. Civ. P. 23 in that

    a. The Class, which includes thousands of members, is so numerous that joinder of all Class Members is impracticable;

    b. There are substantial questions of law and fact common to the Class, including those set forth in greater particularity herein;

    c. Questions of law and fact, such as those enumerated below, which are common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;

    d. The claims of the representative party are typical of the claims of the Class;

    e. A class action is superior to any other type of action for the fair and

efficient adjudication of the controversy;

f.  The relief sought in this class action will effectively and efficiently provide relief to all members of the Class;

g.  The prosecution of separate lawsuits by Class Members would risk inconsistent or varying adjudications. Class-wide adjudication of these claims is, therefore, appropriate.

h.  There are no unusual difficulties foreseen in the management of this class action; and

i.  Plaintiff, whose claims are typical of those of the Class, through his experienced counsel, will zealously and adequately represent the Class.

**B.  Numerosity**

63.  There are thousands, if not millions, of individuals who have viewed or purchased video games on Bandai Namco's website or store while logged into their Facebook accounts. Bandai Namco is one of the largest video game publishers in the world, with substantial online traffic to its websites.

64.  Facebook has billions of monthly active users globally, and the overlap between Facebook users and video game consumers is substantial.

65.  Accordingly, the Class Members are so numerous that joinder of all parties is clearly impracticable.

**C.  Commonality and Predominance**

66.  Numerous common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members, including, but not limited to, the following:

a.  Whether Defendant qualifies as a "video tape service provider" under the VPPA;

b.  Whether Plaintiff and the Class Members are "consumers" under the VPPA;

**CLASS ACTION COMPLAINT**

c. Whether Defendant disclosed "personally identifiable information" as defined by the VPPA to Facebook through its implementation of the Facebook Pixel;

d. Whether Defendant obtained "informed, written consent" from Plaintiff and the Class Members before disclosing their PII to Facebook;

e. Whether Defendant's disclosures were made in the "ordinary course of business" as defined by the VPPA;

f. Whether Defendant's disclosures were knowing and willful;

g. Whether Plaintiff and the Class Members are entitled to statutory damages of $2,500 per person for each violation under the VPPA;

h. Whether Plaintiff and the Class Members are entitled to punitive damages under the VPPA;

i. Whether Defendant utilized dark patterns or deceptive user interface designs to obscure its data collection practices from consumers;

j. Whether Defendant received a "benefit" or "consideration" for sharing Class Members' PII with Facebook; and

k. Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to injunctive relief and restitution.

67. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

**D.    Typicality**

68.    Plaintiff has the same interests in this matter as all other members of the Class, and his claims are typical of the claims of all members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of substantially the same material and substantive facts, utilize the same complex evidence (e.g., expert testimony), rely upon the same legal theories, and seek the same type of relief.

**CLASS ACTION COMPLAINT**

ARIAS SANGUINETTI WANG & TEAM LLP

69.    The claims of the Plaintiff and other Class Members have a common cause and their damages are of the same type. The claims originate from the same unlawful practice: Defendant's disclosure of PII to Facebook without consent.

70.    All Class Members have been aggrieved by Defendant's unlawful practice of disclosing their PII without consent and are entitled to, *inter alia*, statutory damages under the VPPA.

71.    The representative Plaintiff's experiences with Defendant's website are consistent with and representative of the experiences of other Class Members, making class treatment appropriate.

**E.    Adequacy of Representation**

72.    Plaintiff's claims are sufficiently aligned with the interests of the absent Class Members to ensure that the Class' claims will be prosecuted with diligence and care by Plaintiff as representative of the Class. Plaintiff will fairly and adequately represent the interests of the Class, and he does not have interests adverse to the Class.

73.    Plaintiff has retained the services of counsel who are experienced in complex class action litigation, including specifically cases involving privacy violations and consumer protection. Plaintiff's counsel will vigorously prosecute this action and will otherwise protect and fairly and adequately represent the Plaintiff and all absent Class Members.

**F.    Superiority**

74.    A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

    a.   Individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake;

    b.  Individual claims by Class Members would create a risk of inconsistent

**CLASS ACTION COMPLAINT**

or varying adjudications, which would present the Defendant with incompatible standards of conduct;

c.  Individual claims by individual Class Members would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other individuals who are not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

d.  Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

e.  In view of the complexity of the issues and the expenses of litigation, the separate claims of individual Class Members are insufficient in amount to support separate actions;

f.  The Plaintiff seeks relief relating to the Defendant's common actions and the equitable relief sought would benefit the Class as a whole;

g.  The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

h.  The proposed class action is manageable.

## CAUSES OF ACTION

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*

### [Plaintiff and the Class Against All Defendants]

75.  Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

76.  Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

77.  The VPPA provides that a "video tape service provider who knowingly

ARIAS SANGUINETTI WANG & TEAM LLP

discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

78. Under the VPPA, "the term 'video tape service provider' means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials..." 18 U.S.C. § 2710(a)(4).

79. Courts have consistently held that entities that provide videos and video games via digital distribution qualify as "video tape service providers" under the VPPA. See *Edwards*, 2025 WL 985130, at *3-4 (finding that providers of digital video content qualify as 'video tape service providers' under the VPPA)

80. Defendant is a "video tape service provider" because it offers video games for sale on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Video games qualify as "similar audio visual materials" under the statute because they are prerecorded audiovisual content that consumers view and interact with.

81. Under the VPPA, "the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

82. Plaintiff and members of the Class are "consumers" because they purchased or viewed video games offered by Defendant, a video tape service provider. 18 U.S.C. § 2710(a)(1).

83. Under the VPPA, "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

ARIAS SANGUINETTI WANG & TEAM LLP

84.   Courts have consistently held that digital identifiers such as cookies, when combined with information about specific video content viewed or purchased, constitute "personally identifiable information" under the VPPA. See *Salazar*, 118 F.4th at 542-43 (finding that disclosure of Facebook ID cookies along with video viewing information constitutes personally identifiable information under the VPPA); *Edwards*, 2025 WL 985130, at *4 (ruling that website tracking pixels sending video titles with user identifiers to Meta violated the VPPA)

85.   When the Plaintiff and Class Members viewed or purchased video games on Bandai Namco's website or store, Bandai Namco knowingly disclosed their Facebook IDs (via c_user and fr cookies) and the specific video game viewing/purchase information to Facebook via the Facebook Pixel.

86.   The disclosed information is PII because Facebook and anyone with access to that information can personally identify the Plaintiff and Class Members, as well as the specific video game content that each of those respective individuals viewed, considered, or purchased.

87.   The Plaintiff and Class did not provide informed, written consent to Bandai Namco for disclosing their PII to Facebook. At no point during the checkout process or elsewhere on its website did Defendant obtain the "informed, written consent" required by the VPPA.

88.   Bandai Namco neither obtained informed, written consent from the Plaintiff and Class for disclosing their PII to Facebook, nor provided a clear and conspicuous opportunity for them to withdraw from such disclosures on a case-by-case basis, as required by the VPPA. See *Edwards*, 2025 WL 985130, at *7-8 (holding that general references to data sharing in privacy policies do not constitute the 'informed, written consent' required by the VPPA)

89.   Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures

to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

90.    The disclosure of PII to Facebook was not incidental, accidental, or merely negligent, but rather deliberate, calculated, and systematic. Defendant intentionally implemented the Facebook Pixel with full knowledge of its comprehensive tracking capabilities and data-sharing functions, as evidenced by: (1) the careful configuration of specific Facebook Pixel events to track precise user actions throughout the purchase funnel; (2) the implementation of custom parameters to capture detailed information about specific game titles, platforms, and prices; (3) the strategic placement of tracking code on product pages containing video game content; and (4) the ongoing maintenance and updating of this tracking infrastructure across website redesigns and platform changes.

91.    Moreover, Defendant's marketing department and digital analytics teams would have received regular reports containing Facebook Pixel data, demonstrating actual knowledge of the data collection and transmission. Facebook's Business Tools Terms explicitly require businesses implementing the Pixel to obtain appropriate consent from end users, yet Defendant disregarded these requirements. This pattern of conduct demonstrates not merely knowledge but calculated intent to circumvent privacy laws for commercial advantage. The willful, knowing, and intentional nature of these violations, persisting over years despite growing regulatory scrutiny of similar practices across the industry, unequivocally supports Plaintiff's request for maximum statutory and punitive damages under the VPPA.

92.    Where a video tape service provider knowingly discloses the PII of a consumer without consent, the aggrieved person may bring a civil action for, inter alia, statutory damages in an amount not less than $2,500, punitive damages, attorneys' fees and costs. 18 U.S.C. § 2710(c)(2)(A)-(D).

93.    On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief

ARIAS SANGUINETTI WANG & TEAM LLP

establishing that Defendant's practices violate the VPPA; (ii) comprehensive injunctive and equitable relief necessary to protect the interests of Plaintiff and the Class, including but not limited to: an order requiring Defendant to immediately cease the unlawful practices described herein, implement proper consent mechanisms compliant with the VPPA's "informed, written consent" standard, delete all unlawfully collected data, and undergo regular privacy compliance audits by independent third parties; (iii) statutory damages of $2,500 for each discrete violation of the VPPA pursuant to 18 U.S.C. § 2710(c)—which, given the systematic nature of Defendant's conduct, could amount to multiple violations per class member; (iv) substantial punitive damages proportional to Defendant's vast resources for its willful, knowing, and intentional violations of consumer privacy laws designed to protect particularly sensitive information; and (v) reasonable attorneys' fees and costs and other litigation expenses, including expert witness fees for technical testimony regarding the functionality of the Facebook Pixel and data transmission protocols.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, individually and on behalf of the proposed Class, prays for judgment as follows:

A. Certification of the proposed Class by order pursuant to Fed. R. Civ. P. 23;

B. Designation of the Plaintiff as representative of the proposed Class and designation of his counsel as Class counsel;

C. Judgment in favor of the Plaintiff and Class Members as against the Defendant;

D. An award to each Plaintiff and Class Member for statutory damages not less than $2,500 and punitive damages for each violation of the VPPA, including pre- and post-judgment interest;

E. An award of injunctive relief prohibiting Defendant from disclosing the

ARIAS SANGUINETTI WANG & TEAM LLP

PII of its users without consent and in accordance with the VPPA;

F.  An order requiring Defendant to delete all wrongfully obtained PII and prohibiting Defendant from retaining any unlawfully collected PII;

G.  An order requiring Defendant to implement and maintain a comprehensive privacy program designed to protect the confidentiality of Plaintiff's and Class Members' PII;

H.  An order requiring Defendant to engage independent third-party security auditors to conduct annual security audits and tests of Defendant's systems;

I.  An order requiring Defendant to provide clear and conspicuous disclosure to consumers regarding its data collection and sharing practices before collecting any PII;

J.  An award of attorneys' fees and costs, including pre- and post-judgment interest;

K.  An Order holding that Defendant's disclosure of the Plaintiff's and Class' PII without consent was in violation of the VPPA; and

L.  Such further relief that this Honorable Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated:   April 22, 2025            **ARIAS SANGUINETTI WANG**
                                              **& TEAM LLP**

                          By:    */s/Mickel Arias*
                                    MICKEL M. ARIAS, ESQ.
                                    CRAIG S. MOMITA, ESQ.
                                    M. ANTHONY JENKINS, ESQ.

                                    *Attorneys for Plaintiff*