Mike Arias, Esq. (SBN 115385)
mike@aswtlawyers.com
Craig S. Momita, Esq. (SBN 163347)
craig@aswtlawyers.com
M. Anthony Jenkins, Esq. (SBN 171958)
anthony@aswtlawyers.com
Isaac Manoff, Esq. (SBN 347528)
isaac@aswtlawyers.com
**ARIAS SANGUINETTI WANG & TEAM LLP**
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Telephone: (310) 844-9696
Facsimile: (310) 861-0168

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SAMUEL JESSE GARCIA individually and on behalf of all others similarly situated,

Plaintiff,

v.

BANDAI NAMCO ENTERTAINMENT AMERICA, INC.,

Defendant.

CASE NO. 8:25-cv-00967-DOC-PVC

**PLAINTIFF'S OPPOSITION TO DEFENDANT BANDAI NAMCO ENTERTAINMENT AMERICA INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)**

Date: August 11, 2025
Time: 8:30 a.m.
Courtroom: 10 A
Judge: Hon. David O. Carter

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION........................................................... 1

II. PLAINTIFF'S OBJECTION TO DEFENDANT'S REQUEST FOR JUDICIAL NOTICE..........................................................2

III. PLAINITFF'S REQUEST FOR JUDICIAL NOTICE.........................3

IV. PLAINTIFF'S STATEMENT OF RELEVANT FACTS.....................4

A. BNEA'S VIDEO GAME BUSINESS AND FACEBOOK PIXEL IMPLEMENTATION............................4

B. BNEA'S DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION....................................5

C. PLAINTIFF'S EXPERIENCE AND LACK OF CONSENT.........5

D. BNEA'S CONSENT MECHANISMS................................6

i. Cookie Banner...................................................6

ii. Two Purchase Pathways........................................7

E. Tracking Before Consent.............................................8

V. LEGAL STANDARD.........................................................8

VI. THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS PLAITNIFF'S VPPA CLAIM.....................9

A. BNEA DID NOT OBTAIN VALID VPPA CONSENT..............9

i. BNEA's Opt-In Cookie Banner Requires Specific User Action That Did Not Occur......................9

ii. BNEA's Cookie Banner Does Not Work.....................11





ARIAS SANGUINETTI WANG & TEAM LLP

iii. Both User Purchase Pathways Violate VPPA Consent Requirements……………………………..12

iv. Temporal Violation Defeats Any Consent Defense Because Tracking Begins Before All Consent Opportunities……………………………………16

B. BNEA QUALIFIES AS A "VIDEO TAPE SERVICE PROVIDER" UNDER THE VPPA……………………………………………19

C. PLAINTIFF ADEQUATELY ALLEGES DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION……………..21

ARIAS SANGUINETTI WANG & TEAM LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....... 8, 9, 19, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....... 4, 8, 9

*Belozerov v. Gannett Co., Inc.*,
646 F. Supp. 3d 310 (D. Mass. 2022) ....... 19

*Carroll v. General Mills, Inc.*,
2023 WL 4361093 (C.D. Cal. June 26, 2023) ....... 20, 21

*Czarnionka v. Epoch Times Ass'n, Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ....... 22

*Edwards v. MUBI, Inc.*,
No. 24-cv-00638-EKL, 2025 WL 985130 (N.D. Cal. Mar. 31, 2025) ....... 22

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....... 18, 23

*Feldman v. Star Tribune Media Co.*,
659 F. Supp. 3d 1006 (D. Minn. 2023) ....... 2, 13

*Gabrielli v. Motorola Mobility LLC*,
No. 24-cv-09533-JST, 2025 WL 1939957 (N.D. Cal. July 14, 2025) ....... 12

*Golden v. NBCUniversal Media, LLC*,
2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) ....... 19

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ....... 12

*Jancik v. WebMD LLC*,
No. 1:22-CV-644-TWT, 2025 WL 560705 (N.D. Ga. Feb. 20, 2025) ....... 22

ARIAS SANGUINETTI WANG & TEAM LLP

*Lakes v. Ubisoft, Inc.*,
2025 WL 1036639 (N.D. Cal. Apr. 2, 2025) ....................passim

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) ....................19

*Mendoza v. Caesars Entertainment, Inc.*,
2024 WL 2316544 (D.N.J. May 22, 2024) ....................20

*Salazar v. National Basketball Association*
118 F.4th 533 (2d Cir. 2024) ....................17, 22

*Solomon v. Flipps Media, Inc*,
136 F.4th 41 (2d Cir. 2025) ....................23

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ....................17

**STATUTES**

18 U.S.C. § 2710(a)(3) ....................4, 16
18 U.S.C. § 2710(b)(2)(B) ....................9, 17
18 U.S.C. § 2710(b)(2)(B)(ii)(I)–(II) ....................16

**RULES**

Fed. R. Civ. P.
8(a)(2) ....................8, 19
12(b)(6) ....................1, 2
201(b)(2) ....................2

ARIAS SANGUINETTI WANG & TEAM LLP

ARIAS SANGUINETTI WANG & TEAM LLP

## I. INTRODUCTION

This case involves Bandai Namco Entertainment America Inc.'s ("BNEA") systematic disclosure of Plaintiff's video game viewing and purchasing information to Facebook without the informed, written consent required by the Video Privacy Protection Act ("VPPA"). Unlike the deficient allegations that courts have rejected in other cases, Plaintiff alleges concrete facts establishing that BNEA disclosed his Facebook ID—linked to a profile created under his full name "Samuel Jesse Garcia"—along with specific information about video games he viewed and purchased. When combined and transmitted to Facebook via the tracking pixel, this information allows an ordinary person to identify Plaintiff's video-watching habits by simply appending his Facebook ID to "facebook.com" to access his named profile.

BNEA's motion to dismiss fails on multiple grounds. First, unlike *Lakes v. Ubisoft, Inc*., 2025 WL 1036639 (N.D. Cal. Apr. 2, 2025), which involved browse-wrap consent by "continuing to navigate," BNEA implemented an opt-in system requiring users to click "Accept All Cookies"—yet Plaintiff never clicked accept, and testing revealed the banner was non-functional (tracking continued regardless of user selection). Additionally, factual disputes exist regarding which purchase pathway Plaintiff used (BNEA incorrectly asserts account creation is required despite guest checkout being available), both pathways violate VPPA's distinct consent requirements, and tracking began before any consent opportunity. Second, BNEA qualifies as a video tape service provider as the publisher and creator of video games containing extensive prerecorded audiovisual content, which are exemplified in this Eldin Ring cut scene compilation (https://www.youtube.com/watch?v=tySAeZrYxok). Third, Plaintiff adequately alleges disclosure of personally identifiable information under the ordinary person

standard because his Facebook ID directly links to his named profile containing identifying information.

The motion should be denied because these factual disputes regarding consent, the timing of tracking, and Plaintiff's specific allegations are inappropriate for resolution at the Rule 12(b)(6) stage, where all reasonable inferences must be drawn in Plaintiff's favor.

## II. PLAINTIFF'S OBJECTION TO DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

Plaintiff objects to Defendant's request that the Court take judicial notice of its website screenshots and purported consent mechanisms (Exhibits A-J) for the purpose of resolving disputed factual issues on a motion to dismiss

While website screenshots may be proper subjects of judicial notice under Federal Rule of Evidence 201(b)(2), the Court cannot use judicially noticed facts to resolve disputed issues central to the parties' claims and defenses. *Feldman v. Star Tribune Media Co.*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) (VPPA consent "seems like an affirmative defense that the Star Tribune bears the burden to plead and prove"). HERE, Defendant seeks to use these exhibits to establish that Plaintiff consented to data disclosure—an affirmative defense that Defendant bears the burden to plead and prove.

1. **Cookie Consent Banner**: Whether Plaintiff clicked "Accept All Cookies," "Reject All Cookies," or took no action—facts not established by static screenshots. Compl. ¶ 55; Garcia Decl. ¶ 2.
2. **Purchase Pathway**: Which pathway Plaintiff used (account creation or guest checkout), as both exist on Defendant's website.

/ / /

3. **Banner Functionality**: Whether the cookie banner actually prevents tracking, as evidence shows tracking continues regardless of user selection. Compl. ¶ 34; Manoff Decl. ¶ 3.
4. **Timing of Tracking**: When Facebook's pixel begins capturing data relative to consent opportunities. Manoff Decl. ¶¶ 3, 5.

While the Court may take judicial notice of what Defendant's website displays, it cannot use these exhibits to resolve disputed facts about how Plaintiff interacted with the website or whether valid consent was obtained. These factual disputes require discovery, not resolution through judicial notice on a motion to dismiss.

## III. PLAINITFF'S REQUEST FOR JUDICIAL NOTICE

Given that Defendant has introduced certain exhibits related to its website, Plaintiff seeks judicial notice of additional publicly available materials that provide necessary context and demonstrate the complete user experience on Defendant's website. *See Lakes v. Ubisoft, Inc.*, 2025 WL 1036639, at *3 (N.D. Cal. Apr. 2, 2025);

A. **Guest Checkout Screenshot (Manoff Decl., Ex. A):** Shows BNEA's guest checkout contains only generic policy references, not consent to share protected video materials under VPPA.

B. **Purchase Order Confirmation (Manoff Decl., Ex. C):** a true and correct copy of an order confirmation email from Bandai Namco Entertainment America Inc. dated June 26, 2025, for order #634239, demonstrating that guest checkout is functional on Bandai Namco's website without requiring account creation.

C. **Meta Pixel Evidence (Compl. ¶ 34; Manoff Decl. ¶¶ 2-4)**: Screenshot captured using Meta Pixel Helper and attached to the Complaint demonstrates that Facebook tracking begins immediately upon page visit and continues regardless of cookie banner selections, including after clicking "Reject All Cookies."



ARIAS SANGUINETTI WANG & TEAM LLP

D. **YouTube Video (https://www.youtube.com/watch?v=tySAeZrYxok) (Manoff Decl.** ¶11): 1.5-hour compilation of Elden Ring cutscenes demonstrates BNEA's games contain substantial prerecorded audiovisual content qualifying as "video materials" under 18 U.S.C. § 2710(a)(3).

These materials are publicly available and not subject to reasonable dispute.

## IV. PLAINTIFF'S STATEMENT OF RELEVANT FACTS

Accepting as true for purposes of this Motion all factual allegations contained in the Complaint, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007), and incorporating matters materials to judicial notice, the relevant facts are as follows.

### A. BNEA'S VIDEO GAME BUSINESS AND FACEBOOK PIXEL IMPLEMENTATION

Bandai Namco Entertainment America Inc. is "a leading video game publisher and distributor with annual revenues of $7.17 billion" that "develops, markets, and distributes" major gaming franchises including "Dark Souls, Elden Ring, Tekken, Dragon Ball, Pac-Man, Ace Combat, Tales, and hundreds of other titles." Compl. ¶ 26. BNEA "implemented the Facebook Pixel on both its main website and online store," which "establishes a direct connection between a website and Facebook's servers, enabling the real-time transmission of user data." Compl. ¶¶ 20, 27.

Modern video games contain substantial prerecorded audiovisual content. "Video games qualify as 'similar audio visual materials' under the statute because they are prerecorded audiovisual content that consumers view and interact with." Compl. ¶ 80. The 1.5-hour YouTube compilation titled "ELDEN RING All Cutscenes (Game Movie) 4K 60FPS Ultra HD" (available at https://www.youtube.com/watch?v=tySAeZrYxok) demonstrates the extensive video content and "cutscenes" embedded in BNEA's Elden Ring games that Plaintiff purchased. Manoff Decl. ¶ 11.





ARIAS SANGUINETTI WANG & TEAM LLP

**B. BNEA'S DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION**

When Facebook users visit BNEA's websites, "the Pixel automatically transmits data about the user's activity to Facebook," including "PageView, ViewCategory, ViewContent, AddToCart, InitiateCheckout, and PlaceOrder" events with "URLs of pages visited, product IDs, names of video games viewed, buttons clicked, prices, and currencies." Compl. ¶¶ 23, 29. This tracking "is directly linked to their Facebook profiles through specific cookies, including c_user and fr" where the "c_user cookie contains the user's unencrypted Facebook ID ('FID')." Compl. ¶ 30. "A Facebook profile can be identified and viewed by simply appending an FID to the end of 'Facebook.com.'" Compl. ¶ 31.

**C. PLAINTIFF'S EXPERIENCE AND LACK OF CONSENT**

Plaintiff Samuel Jesse Garcia created his Facebook account "under his full name 'Samuel Jesse Garcia'" and "visited Bandai Namco's website multiple times in the months leading up to June 2024" while "logged into his Facebook account." Compl. ¶¶ 46, 48. "Each time Plaintiff initiated an event on Defendant's website (such as viewing a video game product page), the company simultaneously disclosed to Facebook via the Facebook Pixel: Plaintiff's Facebook ID and any logged data associated with the event." Compl. ¶ 49. On June 15, 2024, Plaintiff purchased "ELDEN RING Shadow of the Erdtree Collector's Edition" for $289.35. Compl. ¶ 50.

Plaintiff browsed multiple video game product pages containing "video trailers and gameplay footage" before reaching any consent mechanism. Compl. ¶¶ 48-49. "Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such

ARIAS SANGUINETTI WANG & TEAM LLP

disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook." Compl. ¶ 55. "At no point during these or any other interactions with Defendant's website did Plaintiff receive a clear disclosure about the collection and sharing of his video game viewing and purchasing information with Facebook." Compl. ¶ 54. Plaintiff never clicked 'Accept All Cookies' and never agreed to share his browsing information with Facebook or any third-party advertisers." Garcia Decl. ¶ 2.

**D. BNEA'S CONSENT MECHANISMS**

**i. Cookie Banner**

BNEA's cookie banner states: "By clicking 'Accept All Cookies', you: (1) agree to the storing of cookies on your device to enhance site navigation and analyze site usage and (2) are directing Bandai Namco Entertainment America Inc. to share browsing information with third party advertisers." Def.'s Mot. to Dismiss, Ex. A. The banner provides three options: "Cookies Settings," "Reject All Cookies," and "Accept All Cookies." Id. This language requires clicking "Accept All Cookies" to consent—not continued browsing. Plaintiff never clicked "Accept All Cookies" and BNEA has provided no evidence that he did. Garcia Decl. ¶ 2.




**Def.'s Mot. to Dismiss, Orozco Decl., Ex. A - BNEA Cookie Banner**

Moreover, testing reveals that "the Facebook Meta Pixel fired and began tracking immediately upon visiting any page on Bandai Namco's website, before any interaction with the cookie banner" and "continued to fire and track [user] activities regardless of which option [was] selected on the cookie banner." Manoff Decl. ¶ 3. Even when selecting "Reject All Cookies," "Facebook tracking events were still being transmitted to Facebook's servers." *Id.*

### ii. Two Purchase Pathways

BNEA offers two purchase pathways, contrary to Defendant's assertion that account creation is required. Users can complete purchases on Bandai Namco's website as guests without creating an account. Manoff Decl. ¶ 7. Following meet and confer discussions where defense counsel suggested account creation was necessary, counsel personally "went through [the] whole purchase flow and made a purchase without creating an account," receiving order number #634239. Manoff Decl. ¶ 9, 10; Ex. B, C. Despite being informed of this fact, defense counsel never responded. Manoff Decl. ¶ 9. The record does not establish which pathway Plaintiff used:

**1. Account Creation:** Users encounter a single checkbox stating "I agree to the above statements" that bundles: (1) Bandai Namco ID Terms of Service, (2) Bandai Namco ID Privacy Policy (3) Terms of Service, (4) Servie Privacy Policy; and (5) A vague data sharing disclosure. Def.'s Mot. to Dismiss, Ex. C. "Defendant does not seek its customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise)." Compl. ¶ 40. While BNEA's "privacy policy and terms of service" may "contain general language about third-party cookies or analytics, it does not provide the specific, informed consent required by the VPPA for the sharing of video viewing information." Compl. ¶ 41. Plaintiff




**Def.'s Mot. to Dismiss, Orozco Decl., Ex. C – Bundled Account Creation**



ARIAS SANGUINETTI WANG & TEAM LLP

"do[es] not recall any specific disclosure about video viewing data being shared with Facebook." Garcia Decl. ¶ 2.

**2. Guest Checkout:** Despite a red disclaimer at the top stating "A Bandai Namco Entertainment Store account is required to confirm your digital order," users can still fill in billing and shipping information and successfully click "Place Order" without creating an account. Manoff Decl. ¶¶ 7-8, 11, Ex. A, Ex. C. Users see only "By clicking Place Order you are agreeing to our Privacy Policy and Terms of Service" in small print at the bottom of the payment page, with no video-specific disclosure or mention of Facebook or video tracking—the same inadequate disclosure that appears on the regular checkout page for account holders. Manoff Decl. ¶ 8, Ex. A; see also Def.'s Mot. to Dismiss, Orozco Decl., Ex. B (showing identical checkout disclosure for account holders).

### E. Tracking Before Consent

The Facebook Pixel "results in comprehensive tracking of user activities, from initial site visit to purchase completion." Compl. ¶ 28. This tracking begins immediately upon page load, capturing video viewing data before users reach any consent mechanism—whether the cookie banner, account creation, or checkout pages. Manoff Decl. ¶¶ 3, 5.

## V. LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard

"does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. *Twombly*, 550 U.S. at 556. While the Court must accept all factual allegations as true, this principle "is inapplicable to legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## VI. THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS PLAITNIFF'S VPPA CLAIM

### A. BNEA DID NOT OBTAIN VALID VPPA CONSENT

VPPA requires consent that is "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B). This requirement ensures consumers can make informed decisions specifically about video privacy without being forced to accept unrelated legal obligations. As described below, BNEA's consent mechanisms fail on three independent grounds, each of which alone requires denial of the motion to dismiss.

#### i. BNEA's Opt-In Cookie Banner Requires Specific User Action That Did Not Occur

Defendant relies on *Lakes v. Ubisoft* to argue that cookie banner consent satisfies VPPA requirements, but *Lakes* involved a fundamentally different consent framework. Ubisoft informed users that "continuing to navigate" constituted acceptance of cookie policies—a browse-wrap mechanism requiring no affirmative clicks. 2025 WL 1036639, at *8 (N.D. Cal. Apr. 2, 2025). The court found this approach satisfied VPPA requirements because users understood that continued site use constituted consent.

Defendant relies on *Lakes v. Ubisoft* to argue that cookie banner consent satisfies VPPA requirements, but *Lakes* involved a fundamentally different consent framework. Ubisoft informed users that "continuing to navigate" constituted

acceptance of cookie policies—a browse-wrap mechanism requiring no affirmative clicks. 2025 WL 1036639, at *8 (N.D. Cal. Apr. 2, 2025); Declaration of Cristina Arion in Support of Ubisoft Inc.'s Motion to Dismiss ("Arion Decl.") ¶ 5, Ex. A, Case 3:24-cv-06943-TLT Document 22 (filed Dec. 16, 2024). The court found this approach satisfied VPPA requirements because users understood that continued site use constituted consent.




***Lakes v. Ubisoft, Inc.*, No. 3:24-cv-06943-TLT (N.D. Cal.), Defendant Ubisoft Inc.'s Motion to Dismiss, Declaration of Cristina Arion in Support of Ubisoft Inc.'s Motion to Dismiss ("Arion Decl."), ¶ 5, Ex. A, ECF No. 22 (filed Dec. 16, 2024) - Ubisoft Cookie Banner showing "continuing to navigate" languag**

BNEA implemented a materially different approach. Rather than *Lakes'* browse-wrap framework, BNEA presented users with an apparent opt-in consent mechanism. BNEA's banner states: "By clicking 'Accept All Cookies', you: (1) agree to the storing of cookies on your device to enhance site navigation and analyze site usage and (2) are directing Bandai Namco Entertainment America Inc. to share browsing information with third party advertisers." The banner provides three explicit options: "Cookies Settings," "Reject All Cookies," and "Accept All Cookies." This language establishes that consent occurs only through the specific act of clicking "Accept All Cookies"—not through continued browsing.

However, plaintiff never clicked "Accept All Cookies." Compl. ¶ 55. He does not recall clicking accept, meaning BNEA failed to obtain the action required by its own consent framework. *Id.*; Compl. ¶ 55 ("Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook"). Having abandoned *Lakes'* browse-wrap approach in favor of an opt-in system requiring specific user action, BNEA was required to obtain that action. Def.'s Mot. to Dismiss, Orozco Decl., Ex. A (banner stating "By

ARIAS SANGUINETTI WANG & TEAM LLP

clicking 'Accept All Cookies', you... are directing Bandai Namco Entertainment America Inc. to share browsing information with third party advertisers"). This factual dispute is inappropriate for resolution on a motion to dismiss, and even if it were appropriate, defendant has produced no evidence establishing that plaintiff clicked "Accept All Cookies" on the banner.

**ii. BNEA's Cookie Banner Does Not Work**

Even setting aside the absence of affirmative consent, BNEA's website contains a more fundamental deficiency: BNEA's banner operated non-functionally regardless of user choice. Compl. ¶ 34; Manoff Decl. ¶¶ 3-4. Whether plaintiff ignored the banner or actively clicked "Reject All Cookies," the result was identical—Facebook's tracking pixel activated immediately, capturing his video viewing behavior from the moment he accessed the site. Compl. ¶¶ 23, 34 (screenshot showing Facebook Pixel firing after clicking "Reject All Cookies"); Manoff Decl. ¶ 3(c) ("Even after clicking 'Reject All Cookies,' Facebook tracking events continue to be transmitted to Facebook's servers").

Courts have established that when a banner creates expectations about user control, those expectations must be honored. In *McClung v. AddShopper, Inc.*, the court held that absent clicking an "Accept" button, "it cannot be said that the plaintiffs 'took an action that unambiguously manifested their assent to be bound by the terms and conditions' of the privacy policies." No. 3:23-cv-01996-VC, 2024 WL 189006, at *4 (N.D. Cal. Jan. 17, 2024).

If plaintiff took no action with BNEA's banner—like numerous other class members—he reasonably expected his choice to avoid tracking would be respected. BNEA's language indicated tracking occurs only "by clicking 'Accept All Cookies'" with no guidance regarding the consequences of inaction. Under this apparent opt-in system, user silence should preclude tracking. Instead, BNEA tracked users regardless of their failure to provide consent.

If plaintiff took no action with BNEA's banner—like numerous other class members—he reasonably expected his choice to avoid tracking would be respected. BNEA's language indicated tracking occurs only "by clicking 'Accept All Cookies'" with no guidance regarding the consequences of inaction. Def.'s Mot. to Dismiss, Orozco Decl., Ex. A. Under this apparent opt-in system, user silence should preclude tracking. Instead, BNEA tracked users regardless of their failure to provide consent. Manoff Decl. ¶ 3.

More problematically, if plaintiff affirmatively clicked "Reject All Cookies," he explicitly communicated his refusal to consent to tracking. Yet such users experience identical tracking as those who click accept or take no action. Manoff Decl. ¶ 3(b)-(c). **This contradiction of expressed user preferences has been recognized as problematic by courts.** *See Gabrielli v. Motorola Mobility LLC*, No. 24-cv-09533-JST, 2025 WL 1939957, at *1 (N.D. Cal. July 14, 2025) (denying motion to dismiss where "Despite clicking the 'Reject All' option, however, [plaintiff] learned that Motorola's website continued to load third-party scripts that placed tracking cookies on his device"); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 132 (3d Cir. 2015) (finding privacy claims viable where defendants "surreptitiously exploit[ed]" cookie blocker loopholes).

BNEA's system promises user control while providing none—a non-functional mechanism that violates VPPA requirements regardless of user interaction.

**iii. Both User Purchase Pathways Violate VPPA Consent Requirements**

Even beyond the cookie banner's fundamental failures, BNEA's two user purchase pathways independently violate VPPA's consent requirements. The record does not establish which pathway plaintiff utilized, and BNEA has provided no facts clarifying this during meet and confer. Manoff Decl. ¶¶ 9-10 (defense counsel never

responded to inquiry about whether Mr. Garcia made purchase through an account). Regardless, both pathways fail to provide the video-specific, distinct, and separate consent VPPA requires, making the specific pathway irrelevant to the legal analysis. Compl. ¶¶ 40-41; Def.'s Mot. to Dismiss, Orozco Decl., Exs. B, C; Manoff Decl. ¶ 8, Ex. A. Class members undoubtedly used both pathways, with some creating accounts and others proceeding through guest checkout. Manoff Decl. ¶ 7 (confirming guest checkout is available).

Courts consistently reject both bundled consent and generic policy references for VPPA violations. In *Ade v. Viki*, Inc., the Northern District of California denied a motion to dismiss where defendant argued that plaintiffs consented through bundled Terms of Use incorporating Privacy and Cookie Policies. 2024 WL 1880153, at *3-4 (N.D. Cal. Mar. 28, 2024). Similarly, in *Feldman v. Star Trib. Media Co. LLC*, the federal district court declined to dismiss the VPPA claim based on defendant's argument that plaintiff consented to its Privacy Policy referenced in its Terms of Use, finding it was "not obvious that the Star Tribune Privacy Policy addresse[d] a consumer's consent to disclosure of his or her video-viewing history, and it appear[ed] to cover many legal obligations beyond consent to disclose personally identifiable information under the VPPA." No. 22-CV-1731 (ECT/TNL), 2023 WL 2388381, at *11 (D. Minn. Mar. 7, 2023). Both courts found these consent mechanisms created factual disputes inappropriate for Rule 12(b)(6) resolution.

By contrast, *Lakes* succeeded because Ubisoft implemented granular consent at account creation with **separate checkboxes for different obligations**: "I accept Ubisoft's Terms of Use, Terms of Sale and Privacy Policy" **and distinct checkboxes** for "Share my personal and game data with select partners for marketing purposes" and "Receive exclusive email newsletter content with offers and information about Ubisoft titles." *Lakes v. Ubisoft, Inc.*, No. 3:24-cv-06943-TLT (N.D. Cal.), Defendant Ubisoft Inc.'s Motion to Dismiss, Declaration of Cristina Arion in Support

of Ubisoft Inc.'s Motion to Dismiss ("Arion Decl."), Ex. H, ECF No. 22 (filed Dec. 16, 2024).




***Lakes v. Ubisoft, Inc.*, No. 3:24-cv-06943-TLT (N.D. Cal.), Defendant Ubisoft Inc.'s Motion to Dismiss, Arion Decl., Ex. H, ECF No. 22 (filed Dec. 16, 2024) - Ubisoft Account Creation with Separate Checkboxes**

At checkout, Ubisoft provided specific disclosure stating "Ubisoft processes your personal data for the purpose of purchasing your Ubisoft product. To learn more about the processing of your personal data and to exercise your rights, please refer to Ubisoft's Privacy Policy." *Lakes v. Ubisoft, Inc.*, No. 3:24-cv-06943-TLT (N.D. Cal.), Defendant Ubisoft Inc.'s Motion to Dismiss, Declaration of Cristina Arion in Support of Ubisoft Inc.'s Motion to Dismiss ("Arion Decl."), Ex. I, ECF No. 22 (filed Dec. 16, 2024).

/ / /

/ / /

/ / /

**ARIAS SANGUINETTI WANG & TEAM LLP**




***Lakes* v. Ubisoft, Inc., No. 3:24-cv-06943-TLT (N.D. Cal.), Defendant Ubisoft Inc.'s Motion to Dismiss, Arion Decl., Ex. I, ECF No. 22 (filed Dec. 16, 2024) - Ubisoft Checkout Page with Privacy Disclosure**

This layered approach allowed users to consent specifically to different practices through separated mechanisms with clear, specific language.

Here, regardless of whether users create accounts or proceed directly to guest checkout, BNEA fails to meet this standard. Users who create accounts encounter a single checkbox bundling five separate obligations— 1) Bandai Namco ID Terms of Service; 2) Bandai Namo ID Privacy Policy; 3) Terms of Service; 4) Service Privacy Policy; and 5) A vague data sharing disclosure—all through one ambiguous checkbox stating "I agree to the above statements." Def.'s Mot. to Dismiss, Orozco Decl., Ex. C. The data sharing disclosure vaguely states that BNEA "may share the following information registered in your Bandai Namco ID to the relevant service providers" without specifying which service providers, for what purposes, or how users can control such sharing. Def.'s Mot. to Dismiss, Orozco Decl., Ex. C. **This bundling is far more problematic than the mechanisms rejected in *Ade* and *Feldman* because it forces users to accept four different policy documents and undefined data sharing practices with a single click.** Compl. ¶¶ 40-41 (BNEA "does not seek its customers' prior written consent" and privacy policy "does not provide the specific, informed consent required by the VPPA"). Users cannot consent to video tracking without simultaneously accepting unrelated account terms, multiple policies, and data sharing practices having nothing to do with video privacy.

Any class members who proceeded through guest checkout encountered even weaker consent mechanisms, encountering only a generic reference at checkout stating "By clicking Place Order you are agreeing to our Privacy Policy and Terms of Service" buried at the bottom of the payment page. Manoff Decl. ¶ 8, Ex. A; **This same generic language appears for users who created accounts when they reach the checkout page—meaning even account holders see only this vague reference at the point of purchase.** Def.'s Mot. to Dismiss, Orozco Decl., Ex. B; Manoff Decl. ¶ 8, Ex. A. This language provides no specific video privacy disclosure, no mention of Facebook tracking, and no opportunity to consent specifically to video data sharing. Compl. ¶ 41 (privacy policy "does not provide the specific, informed consent required by the VPPA"). **BNEA's consent mechanisms fail more egregiously than those rejected in *Ade* and *Feldman*.** Whether users create accounts (bundled consent covering four policies) or proceed as guests (generic policy references), they cannot provide the video-specific, distinct, and separate consent VPPA requires.

#### iv. Temporal Violation Defeats Any Consent Defense Because Tracking Begins Before All Consent Opportunities

Even setting aside all consent mechanism failures, BNEA's tracking violates VPPA's temporal requirements. VPPA requires informed, written consent before video tracking begins. Under the VPPA, "consent may be given either at the time disclosure is sought or given in advance of disclosure, for a set period of time not to exceed 2 years." 18 U.S.C. § 2710(b)(2)(B)(ii)(I)–(II); *Lakes v. Ubisoft, Inc.*, No. 24-CV-06943-TLT, 2025 WL 1036639, at *9 (N.D. Cal. Apr. 2, 2025).

The statute defines "personally identifiable information" as information identifying a person as having "requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). **When users browse BNEA's website and view**

**product pages for video games—which contain trailers, gameplay footage, and other video content—they are "requesting" video materials within the meaning of the statute.** Compl. ¶¶ 29, 48-49; see also Compl. ¶ 80 ("Video games qualify as 'similar audio visual materials' under the statute because they are prerecorded audiovisual content that consumers view and interact with"). VPPA's consent requirements apply from the moment users begin viewing this video content, protecting their browsing history as sensitive information the statute squarely shields.

Federal courts emphasize that consent must be obtained before tracking occurs—a banner cannot retroactively legitimize earlier data collection. While addressing California's wiretapping law, the Ninth Circuit in *Javier v. Assurance IQ, LLC* established a temporal principle applicable here: it reversed dismissal where a website began recording visitor information before showing any privacy policy, holding that California law requires "prior consent of all parties to a communication." No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022). The court explained that allowing retroactive consent would undermine the privacy protections the statute was designed to provide. *Id.* This temporal logic applies equally to VPPA's requirement that consent be obtained "at the time the disclosure is sought." 18 U.S.C. § 2710(b)(2)(B).

Federal courts consistently recognize that the VPPA's protections extend beyond traditional sales or rentals. As the Second Circuit held in *Salazar v. National Basketball Association*, "someone doesn't have to spend money to be a VPPA 'subscriber.'" 118 F.4th 533, 551 (2d Cir. 2024). The court explained that the statute protects any "subscriber of goods or services" whose video viewing information is disclosed without consent, regardless of monetary payment. *Id.* at 551-52. Courts have similarly confirmed that the exchange of personal information for video access can create protected VPPA relationships. *Yershov v. Gannett Satellite Info. Network,*

*Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (holding that user who downloaded app and provided personal information in exchange for video access was a "subscriber" protected by VPPA). Moreover, courts recognize that VPPA violations constitute concrete injuries sufficient for Article III standing. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017) (finding that "every disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects" for standing purposes, even though court ultimately found no VPPA violation on the merits).

BNEA's Facebook pixel begins tracking **users' browsing of video game product pages** immediately upon page load, before users encounter any consent mechanism. Compl. ¶¶ 27-28; Manoff Decl. ¶ 3(a). Whether users eventually see the cookie banner, create accounts, or reach checkout, their **browsing behavior—including which video game pages they view, which trailers they watch, and which games they consider purchasing**—has already been captured and transmitted to Facebook throughout their session. Compl. ¶ 29. This temporal violation applies to any users who do not immediately click "Accept All Cookies" upon first encountering the banner—including plaintiff, who did not click accept. Compl. ¶ 55; Garcia Decl. ¶ 2. **Such users browse video game product pages containing video content on BNEA's website before reaching account creation or checkout pages**, meaning their video viewing data is captured and shared with Facebook without any prior consent. Compl. ¶¶ 48, 52; Garcia Decl. ¶¶ 2. Even if BNEA's consent mechanisms were otherwise adequate (which they are not), they cannot cure the temporal violation that occurs when video tracking begins before any consent is obtained. **Users cannot retroactively consent to the sharing of data about which video games they browsed and considered** that has already occurred without their knowledge or permission from the moment they began browsing BNEA's video game content. Compl. ¶¶ 40, 54; Garcia Decl. ¶ 2.

ARIAS SANGUINETTI WANG & TEAM LLP

**B. BNEA QUALIFIES AS A "VIDEO TAPE SERVICE PROVIDER" UNDER THE VPPA**

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Under the *Iqbal* framework, courts determine whether factual allegations "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). BNEA grossly misinterprets this standard by insisting that plaintiffs must specifically allege "cutscenes" to establish video tape service provider status—a hyper-technical requirement that contradicts notice pleading principles.

In *Aldana v. GameStop*, the court found that even GameStop, a video game retailer that merely sells games developed by others, qualified as a video tape service provider. The court held that allegations showing a defendant "is engaged in the business of selling video games, and that those video games include cut scenes" are "sufficient to support an inference that video games are 'substantially involved in the conveyance' of video clips." 2024 WL 708589, at *6 (S.D.N.Y. Feb. 21, 2024). The court explained that "businesses that 'provide [VPPA-covered] video content as well as other media content' that is not covered by the VPPA 'are video service providers under the VPPA.'" *Id.* The court expressly rejected GameStop's argument that video content was merely "incidental," finding VPPA coverage where companies actively sell video games containing video content. Courts consistently find that "short, pre-recorded videos constitute 'similar audio visual material' under the VPPA" and have found VPPA coverage for digital content providers across various industries. *See Golden v. NBCUniversal Media, LLC*, 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340 n.2 (N.D. Ga. 2022); *Belozerov v. Gannett Co., Inc.*, 646 F. Supp. 3d 310, 314 (D. Mass. 2022).

Here, BNEA's case for VPPA coverage is even stronger than GameStop's in *Aldana*. While GameStop merely retails games developed by others, BNEA actually

creates, develops, and publishes the video games containing extensive prerecorded content. The complaint alleges that "Video games qualify as 'similar audio visual materials' under the statute because they are prerecorded audiovisual content that consumers view and interact with." Compl. ¶ 80. It identifies BNEA as "a leading video game publisher and distributor" with "annual revenues of $7.17 billion" that "develops, markets, and distributes" major gaming franchises including "Dark Souls, Elden Ring, Tekken, Dragon Ball, Pac-Man, Ace Combat, Tales, and hundreds of other titles." Compl. ¶ 26. Plaintiff has requested judicial notice of the 1.5 hour "ELDEN RING All Cutscenes (Game Movie) 4K 60FPS Ultra HD" YouTube compilation (available at https://www.youtube.com/watch?v=tySAeZrYxok), providing concrete evidence of extensive prerecorded video content.¶ 11. If GameStop qualified as a video tape service provider under *Aldana* as a mere retailer of games, BNEA certainly qualifies as the actual publisher and creator of video games with substantial audiovisual content.

The cases BNEA cites involved fundamentally different businesses. *Mendoza v. Caesars Entertainment, Inc.*, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024), involved online casino games where the plaintiff failed to allege any "prerecorded content such as 'cut scenes'" and made only "conclusory" allegations about video content. Unlike BNEA's narrative-driven games with extensive cutscenes and prerecorded content, Compl. ¶¶ 26, 80; Manoff Decl. ¶ 11, Caesars' slot machines contained no prerecorded audiovisual materials that would qualify under the VPPA.

*Carroll v. General Mills, Inc.*, 2023 WL 4361093, at *3-4 (C.D. Cal. June 26, 2023), involved a food manufacturer that merely used videos "as a peripheral part of its marketing strategy." The court applied the test that a defendant must be "engaged in the business" of delivering video content as its "particular field of endeavor," with products "significantly tailored to serve that purpose." Id. at *3. Because General Mills' "income comes from making and selling food, not videos," and the videos

were merely "part of Defendant's brand awareness" rather than its core business, the court found no VPPA coverage. Id. Unlike General Mills, BNEA's core business is creating and selling video games—interactive audiovisual entertainment products specifically tailored to deliver prerecorded video content. Compl. ¶ 26 (BNEA is "a leading video game publisher and distributor with annual revenues of $7.17 billion" that "develops, markets, and distributes" major gaming franchises); Compl. ¶ 80 ("Video games qualify as 'similar audio visual materials' under the statute because they are prerecorded audiovisual content that consumers view and interact with").

### C. PLAINTIFF ADEQUATELY ALLEGES DISCLOSURE OF PERSONALLY IDENTIFIABLE INFORMATION

To plead a disclosure of PII under the VPPA, Plaintiffs must allege that BNEA conveyed information "identify[ing]" both (i) the "specific video materials or services" requested or obtained, and (ii) the person who "requested or obtained" that material. VPPA § 2710(a)(3). The complaint meets both standards. It alleges that BNEA disclosed Plaintiff's Facebook ID along with specific game viewing information to Facebook via the Pixel. Compl. ¶ 49. Critically, Plaintiff alleges his Facebook profile was created "under his full name 'Samuel Jesse Garcia'" and that "a Facebook profile can be identified and viewed by simply appending an FID to the end of 'Facebook.com.'" Compl. ¶¶ 31, 46. An ordinary person need not extract anything from code; the Facebook ID, when appended to Facebook.com, directly accesses the named profile. For example, if Plaintiff's Facebook ID is "123456789" and his profile shows his full name "Samuel Jesse Garcia," then an ordinary person can simply type "facebook.com/123456789" into any web browser, which directly opens Samuel Jesse Garcia's Facebook profile showing his name and other identifying information. No code extraction, technical parsing, or specialized knowledge is required—just the basic, publicly-known method of accessing Facebook profiles.

Multiple courts have established that installing and using Facebook Pixel constitutes knowing disclosure of personally identifiable information under the VPPA. In *Aldana v. GameStop*, the court held that "providing a third party with PII that is legible to that specific third party is sufficient to state a claim under the VPPA." 2024 WL 708589, at *8 (S.D.N.Y. Feb. 21, 2024). The court quoted approvingly from *Czarnionka*, noting that "[b]y installing the [Facebook Tracking] Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within." *Id.* at *9 (quoting *Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022)). Courts consistently recognize that the Facebook Pixel automatically transmits user information to Facebook, making disclosure claims viable. *See Jancik v. WebMD LLC*, No. 1:22-CV-644-TWT, 2025 WL 560705, at *1 (N.D. Ga. Feb. 20, 2025) (explaining that "[t]he Pixel records information such as the metadata for a webpage that a user visits and a user's button clicks, then transmits that information to Facebook" and that "Facebook matches (or attempts to match) the user's activity to a Facebook profile"); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 553 (2d Cir. 2024) ("Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988."); *Edwards v. MUBI, Inc.*, No. 24-cv-00638-EKL, 2025 WL 985130, at *4 (N.D. Cal. Mar. 31, 2025) (finding similar Facebook Pixel disclosures sufficient to survive dismissal and noting that "[t]he Court does not resolve factual disputes on a motion to dismiss"). BNEA's attempt to distinguish these cases fails because none of their arguments actually undermine the fundamental holding that Facebook Pixel disclosures can constitute PII under the VPPA—*Jancik*'s procedural posture at class certification does not negate its recognition of viable VPPA claims, *Salazar*'s focus on the "consumer" definition issue does not reject the PII disclosure theory, and *Edwards*' acceptance of well-

pleaded allegations at the Rule 12(b)(6) stage is precisely the standard that applies here.

BNEA's reliance on *Solomon v. Flipps Media, Inc.* is misplaced because that case involved fundamentally different factual allegations. In *Solomon*, 136 F.4th 41, 54 (2d Cir. 2025), the court found allegations deficient because the plaintiff failed to adequately allege that her Facebook profile contained identifying information or that an ordinary person could connect the coded FID to her identity. The court noted that the complaint was "devoid of any details about how an ordinary person would use an FID to identify" the plaintiff. *Id.* at 55. Additionally, the *Solomon* plaintiff used only "a hypothetical Facebook profile to illustrate [her] claims but [did] not depict [her] personal Facebook profile or specify any identifiable information that exists in her profile." *Id.* at 46. Here, the complaint differs materially from these deficient allegations. Unlike *Solomon*, Plaintiff alleges his Facebook profile was created "under his full name 'Samuel Jesse Garcia'" and that "a Facebook profile can be identified and viewed by simply appending an FID to the end of 'Facebook.com.'" Compl. ¶¶ 31, 46. Unlike the purely numerical device identifiers in *Eichenberger v. ESPN Inc.*, 876 F.3d 979, 986 (9th Cir. 2017), Facebook IDs are specifically designed to link users to their personal profiles containing identifying information—and the *Eichenberger* court specifically noted that "A Facebook link ... may very well readily enable an 'ordinary person' to identify an individual." *Id.* at 986. BNEA fundamentally mischaracterizes the allegations by focusing on technical code extraction rather than the actual disclosure theory. The complaint alleges that BNEA disclosed Plaintiff's Facebook ID along with "specific information about the game viewed" to Facebook via the Pixel. Compl. ¶ 49. The combination of a Facebook ID linked to a named profile and specific game information satisfies the "ordinary person" standard under *Eichenberger*, 876 F.3d at 985, and establishes the necessary

connection between the FID and Plaintiff's identity under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Dated: July 21, 2025

**ARIAS SANGUINETTI WANG & TEAM LLP**

By: */s/Mickel Arias*
MICKEL M. ARIAS, ESQ.
CRAIG S. MOMITA, ESQ.
M. ANTHONY JENKINS, ESQ.

*Attorneys for Plaintiff*

ARIAS SANGUINETTI WANG & TEAM LLP