KARIN G. PAGNANELLI (SBN 174763)
kgp@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

LUCY H. PLOVNICK (*pro hac vice*)
lhp@msk.com
MITCHELL SILBERBERG & KNUPP LLP
1818 N. Street NW, 7th Floor
Washington, DC 20036
Telephone: (202) 355-7900
Facsimile: (202) 355-7899

Attorneys for Defendant
Bandai Namco Entertainment America Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL JESSE GARCIA individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANDAI NAMCO ENTERTAINMENT AMERICA, INC.,<br><br>Defendant. | CASE NO. 8:25-cv-00967-DOC-PVC<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT BANDAI NAMCO ENTERTAINMENT AMERICA INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date: August 11, 2025<br>Time: 8:30 a.m.<br>Courtroom: 10 A<br>Judge: David O. Carter |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 6

II. BNEA'S REQUEST FOR JUDICIAL NOTICE SHOULD BE GRANTED .......... 7

III. DEFENDANT'S OBJECTION TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE AS TO REQUESTS B, C, AND D. .......... 9

IV. DEFENDANT'S OBJECTION TO PLAINTIFF'S DECLARATIONS .......... 11

V. ARGUMENT .......... 12

- A. Plaintiff's Claims Are Barred By His Consent to BNEA's Data Sharing Practices .......... 12
  - 1. Plaintiff Created An Account And Accepted BNEA Privacy Policy. .......... 13
  - 2. BNEA and Ubisoft Cookie Banners .......... 14
  - 3. Plaintiff Fails to Plead That He Never Accepted BNEA's Cookie Banner or the BNEA's Privacy Policy .......... 14
  - 4. Consent Is Sufficient as a Matter of Law .......... 15
- B. BNEA Is Not a "Video Tape Service Provider" .......... 18
  - 1. Video Games Are Not Similar Audio Visual Materials .......... 19
  - 2. BNEA Is Not Substantially Involved In the Delivery Of Prerecorded Video Content .......... 21
- C. Plaintiff Fails To Plausibly Allege the Disclosure of PII .......... 24

VI. CONCLUSION .......... 28


Mitchell Silberberg & Knupp LLP

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aldana v. GameStop, Inc.*,
2024 WL 708589 (S.D.N.Y. Feb. 21, 2024) .......... 20, 21

*Ambrose v. Bos. Globe Media Partners LLC*,
2022 WL 4329373 (D. Mass. Sept. 19, 2022) .......... 23

*Cantu v. Tapestry, Inc.*,
2023 WL 4440662 (S.D. Cal. 2023) .......... 22, 23

*Cappello v. Walmart, Inc.*,
2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) .......... 23

*Carroll v. Gen. Mills, Inc.*,
2023 WL 4361093 (C.D. Cal. June 26, 2023) .......... 22

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
423 F.Supp.2d 173 (S.D.N.Y. 2006) .......... 7

*Eichenberger v.ESPN Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 25, 27

*Feldman v. Star Trib. Media Co. LLC*,
659 F. Supp. 3d 1006 (D. Minn. 2023) .......... 8, 15

*Gerritsen v. Warner Bros. Ent. Inc.*,
112 F. Supp. 3d 1011 (C.D. Cal. 2015) .......... 10

*Google Location Hist. Litig.*,
428 F. Supp. 3d 185, 189-90 (N.D. Cal. 2019) .......... 7

*Hughes v. Nat'l Football League*,
2025 WL 1720295 (2d Cir. June 20, 2025) .......... 25

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 24

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3rd Cir. 2016) .......... 20

## TABLE OF AUTHORITIES
(continued)


**Page(s)**

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ........ 22

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ........ 18

*Jones v. Tonal Sys., Inc.*,
751 F.Supp.3d 1025 (S.D. Cal. 2024) ........ 7

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........ 12

*Lakes v. Ubisoft, Inc.*,
2025 WL 1036639 (N.D. Cal. Apr. 2, 2025) ........ 6, 7, 8, 11, 12, 13, 14, 16, 17, 18

*Lee v. Delta Air Lines Inc.*,
2021 WL 4497209 (C.D. Cal. Aug. 23, 2021) ........ 10, 11

*Mendoza v. Caesars Ent., Inc.*,
2024 WL 2316544 (D.N.J. May 22, 2024) ........ 21

*Newtok Vill. v. Patrick*,
21 F.4th 608 (9th Cir. 2021) ........ 11

*Osheske v. Silver Cinemas Acquisition Co.*,
700 F. Supp. 3d 921 (C.D. Cal. 2023), *aff'd*, 132 F.4th 1110 (9th Cir. 2025) ........ 23

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........ 24

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ........ 8

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........ 6, 25, 26, 27

*Stark v. Patreon, Inc.*,
635 F.Supp.3d 841 (N.D. Cal. 2022) ........ 20


Mitchell Silberberg & Knupp LLP

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tawam v. Feld Ent. Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) .......... 24

*Wilkins v. Smith*,
2025 WL 1558179 (E.D. Cal. June 2, 2025) .......... 10

### STATUTES

18 U.S.C.
§ 2710(a)(1) .......... 17
§ 2710(a)(4) .......... 18, 19, 21
§ 2710(b)(2)(B) .......... 17
§ 2710(b)(2)(B)(i) .......... 16
§ 2710(b)(2)(B)(ii)(I) .......... 17
§ 2710(b)(2)(B)(ii)(II) .......... 17

### OTHER AUTHORITIES

Fed. Rules of Civ. Proc.
12(b)(6) .......... 6, 11, 12

Fed. Rules of Evid.
201 .......... 7, 10

Mitchell Silberberg & Knupp LLP

## I. INTRODUCTION

Plaintiff Samuel Jesse Garcia ("Plaintiff") has not plead sufficient facts to support his claim that Defendant Bandai Namco Entertainment America Inc. ("BNEA") violated the Video Privacy Protection Act ("VPPA"). Plaintiff' offers a baseless objection to BNEA's request for judicial notice, evades most of BNEA's arguments, and ignores or mischaracterizes the majority of case law cited in BNEA's Motion to Dismiss (the "Motion"). Indeed, Plaintiff's Opposition reveals that Plaintiff's claims have no merit.

Plaintiff, apparently recognizing the deficiencies in his Complaint, now attempts to cure them—not through an amendment—but instead, by padding the record through a procedurally improper request for judicial notice and supplemental declarations submitted by Plaintiff and his counsel. However, as discussed below, judicial notice is not the appropriate vehicle to amend or supplement insufficient allegations in a pleading. Moreover, Plaintiff's attempt to supplement his deficient Complaint through additional declarations is inappropriate in the context of a Rule 12(b)(6) motion.

And, even if Plaintiff were to amend the Complaint, any such amendment would be futile. As explained in the Motion, Plaintiff's allegations fail as a matter of law and cannot be salvaged by the materials referenced in Plaintiff's request for judicial notice because (i) like in *Lakes v. Ubisoft, Inc.*, 2025 WL 1036639 (N.D. Cal. Apr. 2, 2025) ("*Ubisoft*"), Plaintiff's claims are barred by his consent to the disclosed privacy policies of BNEA; (ii) BNEA is not a "video tape service provider" within the meaning of the VPPA; and (iii) like in *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025) ("*Solomon*"), Plaintiff failed to plausibly allege that BNEA disclosed his "personally identifiable information."

For all of these reasons, BNEA respectfully requests that the Court grant its Motion and dismiss the Complaint with prejudice, and without leave to amend.

## II. BNEA'S REQUEST FOR JUDICIAL NOTICE SHOULD BE GRANTED

Plaintiff opposes Defendant's request for judicial notice of screenshots of the publicly available BNEA websites: www.bandainamcoent.com (the "Corp. Website") and store.bandainamcoent.com (the "Store Website") (the Corp. Website and Store Website are collectively referred to herein as, the "BNEA Websites" or "Websites"). As explained below, Plaintiff's objection is baseless.

BNEA requested judicial notice pursuant to Federal Rule of Evidence 201, seeking judicial notice of the same types of information that the court took judicial notice of in *Ubisoft*–screenshots of its website and policies covering cookies, pixels, and data sharing. *Ubisoft,* 2025 WL 1036639, at *3. Like in *Ubisoft*, Plaintiff's Complaint here relied on highly selective and incomplete portions of the BNEA Websites. Like in *Ubisoft*, Defendant's request for judicial notice seeks to include additional portions of its publicly available Websites, of which the Court may properly take judicial notice, so that the Court has a complete picture of the user's journey, what the user consents to, and the policies they are provided and agree to. *Id.*; *see also, Google Location Hist. Litig*., 428 F. Supp. 3d 185, 189-90 (N.D. Cal. 2019) (granting defendant's request for judicial notice of publicly available websites in CIPA and California Constitution invasion of privacy class action).

Here, judicial notice was requested by BNEA not to prove any contested facts, but to demonstrate an accurate picture of the publicly available Websites that form the basis of Plaintiff's Complaint. *See Jones v. Tonal Sys., Inc*., 751 F.Supp.3d 1025, 1031 (S.D. Cal. 2024) (granting request for judicial notice of four printouts of publicly available website pages because plaintiff's "characterizations of the website chat feature ***'form the basis' of her lawsuit***.") (emphasis added; internal quotations omitted); *see also*, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F.Supp.2d 173, 179 n. 8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion

Mitchell Silberberg & Knupp LLP

to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'")

Plaintiff argues that judicial notice of screenshots of the BNEA Websites is not proper since the issue of consent under the VPPA purportedly should not be decided at the motion to dismiss stage. Opp.at 2. Plaintiff cited to a single Minnesota district court decision in support of this argument, *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1023 (D. Minn. 2023) ("Feldman"), which is clearly distinguishable. In *Feldman*, the court denied defendant's motion to dismiss related to the consent issue because the parties cited "no particular authority […] interpreting or applying [the VPPA consent] provision, and the provision receive[d] no specific attention in the parties' briefing." *Id.* Unlike in *Feldman*, BNEA specifically addressed the issue of consent in its briefing, and cited *Ubisoft* where the court not only analyzed the issue, but also granted defendant's request for judicial notice to assist the court in evaluating the issue of VPPA consent.

Moreover, contrary to Plaintiff's argument, consent *is* an appropriate subject for a motion to dismiss where lack of consent—like here—is an element of the claim. *See Ubisoft*, 2025 WL 1036639, at *4 ("Consideration of consent is appropriate on a motion to dismiss where lack of consent is an ***element of the claim***.") (quoting *Silver v. Stripe Inc.*, No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *2 (N.D. Cal. July 28, 2021) (emphasis added)); *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming motion to dismiss based on consent). Here, like in *Ubisoft*, Plaintiff alleges in the Complaint (at ¶ 40, 55) that he never consented to BNEA's collection of his personal information. Therefore, BNEA's request for judicial notice is appropriate, and should be granted.

## III. DEFENDANT'S OBJECTION TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE AS TO REQUESTS B, C, AND D.

In his Opposition, after objecting to Defendant's request for judicial notice, Plaintiff requests that the Court take judicial notice of four items: (A) a screenshot of the guest checkout page on the Store Website (Manoff Decl., Ex. A); (B) a copy of a purchase order confirmation email dated June 26, 2025, for order #634239 (Manoff Decl., Exhibit C); (C) a screenshot of the Meta Pixel Helper (Compl. ¶ 34; Manoff Decl. ¶¶ 2-4); and (D) a YouTube video compilation titled "All Elden Ring Cutscenes"[1], which is a 1.5-hour video compilation of Elden Ring cutscenes (Manoff Decl. ¶11).

BNEA has no objection to Plaintiff's request (A), which seeks judicial notice of a screenshot of the guest checkout page on the Store Website, which appears to be a document upon which judicial notice can be taken.

However, BNEA objects to Plaintiff's remaining requests for judicial notice (B), (C), and (D), as each of these items are not proper subjects for judicial notice, and instead are attempts by the Plaintiff to create disputed factual issues or improperly amend the Complaint.

Plaintiff's request (B) is for a copy of a purchase order confirmation email for a physical game already released on the Store Website, which Plaintiff's counsel asserts he personally purchased on June 26, 2025, following a meet and confer discussion with counsel for BNEA. Manoff Decl. ¶ 10. Not only is this email confirmation not a publicly available document, it has nothing to do with the pre-order purchase that Plaintiff alleges he made on June 15, 2024. Compl. ¶ 50. Moreover, the purchase made by Plaintiff's counsel referenced in the email confirmation is not a pre-order, but instead relates to the purchase of an already released physical game. It is irrelevant to the claims asserted in the Complaint, and

[1] The YouTube video that Plaintiff requests the Court to take judicial notice of is an unauthorized gameplay video that infringes BNEA's copyright and may be subject to a DMCA takedown notice.

likewise represents an improper effort to supplement or amend the pleadings under the guise of judicial notice.

Neither is Plaintiff's request (C), a screenshot of the Meta Pixel Helper purporting to show how BNEA's cookie settings are configured, a proper subject for judicial notice. It is not a publicly available document whose accuracy cannot reasonably be questioned. Moreover, the screenshot is clearly offered to supplement Plaintiff's allegations in the Complaint.

Finally, Plaintiff's request (D), a 1.5-hour video compilation purportedly capturing the "cutscenes" in Elden Ring (Manoff Decl. ¶11), is not a proper subject for judicial notice. Indeed, a YouTube video that is more than an hour long, and which is not even authenticated, is not a proper subject for judicial notice. *See Wilkins v. Smith*, 2025 WL 1558179, at *2 (E.D. Cal. June 2, 2025) ("the court does not take judicial notice of documents, the court takes judicial notice of facts as explained in Rule 201 of the Federal Rules of Evidence.")

Requests (B), (C), and (D) pertain to the issues that were not alleged in the Complaint and are not appropriate for judicial notice because a motion to dismiss tests the legal sufficiency of the allegations in the complaint. Courts routinely reject attempts to bolster a deficient pleading with unsupported or disputed facts offered by counsel or the plaintiff outside the four corners of the complaint. *See Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (denying request for judicial notice where plaintiff relies on the judicial notice request to supplement the allegations in her complaint). Plaintiff cannot utilize the requests for judicial notice to amend the Complaint in order to defeat a motion to dismiss. *Id.* ("Plaintiffs cannot utilize the documents to amend the complaint and defeat defendants' motions to dismiss."); *see also*, *Lee v. Delta Air Lines Inc.*, 2021 WL 4497209, at *7 (C.D. Cal. Aug. 23, 2021) ("Plaintiff cannot amend a complaint by filing a request for judicial notice.")

In support of his request for judicial notice, Plaintiff strangely cites to *Ubisoft*. The *Ubisoft* Court however allowed the ***defendant*** to introduce exhibits related to its website because, like in this case, the plaintiff in *Ubisoft* intentionally omitted parts of the publicly available website to ignore those that did not corroborate the allegations. *See Ubisoft*, 2025 WL 1036639, at *3. The distinction is critical – Plaintiff is master of his complaint and responsible for articulating cognizable claims. *See e.g.*, *Newtok Vill. v. Patrick*, 21 F.4th 608 (9th Cir. 2021). Therefore, the proper remedy to cure the deficiencies of the complaint is to amend a complaint, rather than seek a judicial notice. *See e.g.*, *Lee*, 2021 WL 4497209, at *7 (C.D. Cal. Aug. 23, 2021).[2]

Accordingly, Plaintiff's improper requests for judicial notice (B), (C), and (D) must be denied.

## IV. DEFENDANT'S OBJECTION TO PLAINTIFF'S DECLARATIONS

Plaintiff's declarations submitted in support of the Opposition—including the declaration of his counsel, Isaac Manoff, and Plaintiff's own declaration—are obviously improper at the motion to dismiss stage. These declarations both purport to introduce factual assertions that go beyond the pleadings and are not appropriate for consideration by the Court in connection with a motion to dismiss under Rule 12(b)(6).

The Declaration of Plaintiff, Samuel Jesse Garcia, purports to add a new factual allegation that was never pled by Plaintiff in his Complaint – that Plaintiff never interacted with BNEA's Cookie Banner. *See* Declaration of Samuel Jesse Garcia in Support of Plaintiff's Opposition ¶ 2 ("Garcia Decl."). This statement is nowhere to be found in Plaintiff's Complaint, which completely ignores the existence of (and fails to even mention) BNEA's Cookie Banner. Plaintiff's improper attempts to introduce a new factual allegation that was not pled in the

[2] Defendant does not concede that an amendment would cure the substantive defects in the Complaint. As discussed below, it would not.

Complaint should be rejected by the Court, and should not be considered in connection with Defendant's Motion.

Similarly, the allegations made in the Declaration of Isaac Manoff in Support of Plaintiff's Opposition regarding the functionality of the Facebook Pixel, communications with BNEA's legal counsel, and his "additional research" into BNEA's games—resulting in him purportedly locating a 1.5-hour YouTube video—are all a transparent attempt to improperly add new evidence in an ill-fated attempt to cure the Complaint's numerous deficiencies, which are described in detail in the Motion.

It is clear that "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Accordingly, the Court should disregard both declarations in their entirety.

## V. ARGUMENT

### A. Plaintiff's Claims Are Barred By His Consent to BNEA's Data Sharing Practices

BNEA provides users with notice of its data sharing practices through its Cookie Banner and Privacy Policy, which was affirmatively accepted by Plaintiff during the account creation process – a consent mechanism that was confirmed sufficient under the VPPA by *Ubisoft*. The consent mechanisms offered by BNEA here function the same way as in *Ubisoft* and satisfy the VPPA.

Plaintiff's attempt to distinguish this case from *Ubisoft* fails. Contrary to Plaintiff's allegations, the Cookie Banner implemented by BNEA and the account creation process are functionally equivalent to those in *Ubisoft*.

### 1. Plaintiff Created An Account And Accepted BNEA Privacy Policy.

It is clear that Plaintiff affirmatively accepted BNEA Privacy Policy to pre-order a video game through the Store Website in the checkout flow. Orozco Decl. ¶ 14, Ex. G to the Motion. As alleged by Plaintiff in the Complaint, he ***pre-ordered*** the "ELDEN RING Shadow of the Erdtree Collector's Edition" from the Store Website. Complaint ¶ 50. The guest checkout option addressed in the Opposition is irrelevant because Plaintiff alleged in the Complaint that he ***pre-ordered*** a game. There is no option available on the BNEA Websites to make a pre-order or purchase a digital game without first creating a BNEA account and agreeing to the BNEA's Privacy Policy. Orozco Decl. ¶ 14, Ex. G to the Motion.

Plaintiff's counsel simply ignores the fact that the guest checkout functionality is not available for pre-orders, as explained in the Motion and supporting declaration. *Id.* Had Plaintiff's counsel chosen to pre-order a game, he would have been required to create an account, but he instead chose to purchase an already released physical game. There were never "Two Purchase Pathways" available to Plaintiff – Plaintiff was required to create a BNEA account to pre-order the game. It is not possible to pre-order a game through the BNEA's Websites, as Plaintiff alleges, without first creating a BNEA account and agreeing to the BNEA's Privacy Policy. Orozco Decl. ¶ 14, Ex. G to the Motion. Orozco Decl. ¶ 14, Ex. G to the Motion.

Both this check-out flow and the account creation flow requiring acceptance of the Privacy Policy are functionally identical to the consent flows in *Ubisoft*. *See Ubisoft, Inc.*, 2025 WL 1036639, at *2 (finding that a check-out process where user is presented with the Privacy Policy during the checkout process is sufficient to constitute consent under the VPPA).

### 2. BNEA and Ubisoft Cookie Banners

Plaintiff attacks the sufficiency of the notice of the data collection practices provided by BNEA's Cookie Banner, arguing that cookie banner in *Ubisoft* case was "a browse-wrap mechanism," while BNEA's Cookie Banner purportedly is an opt-in cookie banner that involves "a fundamentally different consent framework." Opp. at 9. In support of this argument, Plaintiff cites to one of the declarations submitted in the *Ubisoft* case describing the functionality of the cookie banner. Plaintiff's arguments completely mischaracterize the court's holding in *Ubisoft*. Nowhere in the decision did the *Ubisoft* court hold that there was "a browse-wrap mechanism" with the cookie banner at issue, as Plaintiff wrongly suggests. On the contrary, the *Ubisoft* court, analyzing the sufficiency of the cookie banner, concentrated on the disclosures provided to the user, specifically the absence of any legal or financial obligations "that would distract from [user's] consent." *Ubisoft*, 2025 WL 1036639, at *9.

Similarly, the BNEA's Cookie Banner provided Plaintiff with a hyperlink labeled "set your cookies," which opened a pop-up window allowing users to manage their cookie preferences. As in *Ubisoft*, there were no legal or financial obligations that could have distracted users from the disclosures made. Accordingly, Plaintiff's allegations that the cookie banners here are somehow materially different—or that such differences are critical to the Court's finding regarding the sufficiency of consent—are not supported by the *Ubisoft* decision.

### 3. Plaintiff Fails to Plead That He Never Accepted BNEA's Cookie Banner or the BNEA's Privacy Policy.

Plaintiff's Complaint contains only the unspecified allegation that "Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook." Compl. ¶ 55. Again, Plaintiff's Complaint contains no allegations about the BNEA's Cookie Banner. Plaintiff now attempts to cure his apparently intentional omission of the BNEA's Cookie

Banner by trying to improperly supplement the Complaint with statements that were not initially alleged. *See* Opp. at 10 ("plaintiff never clicked 'Accept All Cookies'"). As explained *supra*, it is entirely inappropriate for Plaintiff to supplement his deficient Complaint in this manner in connection with this Motion.

**4. Consent Is Sufficient as a Matter of Law**

The Opposition further alleges "Both User Purchase Pathways Violate VPPA Consent Requirements" because (i) consent was "bundled"; (ii) "not layered," and (iii) given too late to constitute valid consent. As discussed below, these arguments are spurious.

***a. "Bundled" Consent***

Plaintiff appears to assert that the VPPA requires consumers to be given separate "check boxes" to accept a seller's Privacy Policy and Terms of Service (referred to as "Terms of Use" in Plaintiff's Opposition and in this Reply). *Opp.* at 13. However, the precedent cited in the Opposition does not support this assertion in any way. Indeed, the cases cited involved matters regarding individuals who consented to "bundled" Privacy Policies and Terms of Use, but neither of those cases held that separate check boxes were specifically required to comply with the VPPA. *See* Opp. at 13 citing *Ade v. Viki, Inc*. 2024 WL 1880153, at *3-4 (N.D. Cal. Mar. 28, 2024) (plaintiffs consented through ***bundled*** Terms of Use ***incorporating*** Privacy and Cookie Policies); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1023 (plaintiff consented to its privacy policy ***referenced*** in its terms of use). These authorities simply do not stand for the rule that "separate checkboxes" are required for Privacy Policy and Terms of Use, as Plaintiff wrongly suggests. Opp. at 13.

Furthermore, Plaintiff seems to argue in the Opposition that BNEA improperly "bundled" its Privacy Policy and Terms of Use, but the Complaint is devoid of any such assertion, and Plaintiff cannot allege such assertion because BNEA's Privacy Policy and Terms of Use are presented to consumers separately in

numerous ways, such as separate hyperlinks in the footer of the Websites, as further described in the Motion.

***b. Layered Consent***

Plaintiff makes even more confusing allegations about the "layered approach" of the *Ubisoft* consent form. Without citing to any authority, Plaintiff argues that the *Ubisoft* consent form offered extra check boxes for marketing purposes that "provide[s] the video-specific, distinct, and separate consent VPPA requires." Opp. 15-16. But this is clearly incorrect. *Ubisoft*'s consent form contains three check-boxes: (i) "I accept Ubisoft's Terms of Use, Terms of Sale and Privacy Policy[;]" (ii) "Share my personal and game data with select partners for marketing purposes[;]" and (iii) "Receive exclusive email newsletter content with offers and information about Ubisoft titles. I can unsubscribe at any time." *Id.* None of these options make any reference to the VPPA or "video-specific" consent. And notably, *Ubisoft*'s privacy policy and terms of use are also accepted through a single check-box. Nor did the court hold that check boxes are required to satisfy VPPA consent. *See Ubisoft*, 2025 WL 1036639, at *9 ("The court finds that defendant's cookies banner, account creation, and checkout consent flow satisfy all of the requirements of VPPA's consent provision.").

In any event, the VPPA does not require that consent be presented in isolation—only that it not be conditioned on legal or financial obligations. 18 U.S.C. § 2710(b)(2)(B)(i). Here, users were not subject to any such obligations through BNEA's Cookie Banner or Privacy Policy that would undermine their ability to consent. Plaintiff's novel interpretation would lead to an unworkable standard, effectively requiring websites to display separate click-wrap agreements for every category of cookie, Privacy Policy, and Terms of Use, which would overwhelm users and impair meaningful consent.

***c. Untimely Consent***

Plaintiff also argues that any consents Plaintiff provided via account creation or checkout are invalid under the VPPA because they purportedly fail to meet the statute's timing requirements. Specifically, Plaintiff claims that "[w]hen users browse BNEA's website and view product pages for video games—which contain trailers, gameplay footage, and other video content—they are 'requesting' video materials within the meaning of the statute." Opp. at 17. Here, as in many other portions of the Opposition, Plaintiff relies on allegations that were never actually made in the Complaint. Plaintiff has not alleged what part of the BNEA Websites or products constitute "similar" prerecorded video materials. But even assuming—contrary to the record—that such an allegation had been made, the argument still fails.

The VPPA does not require consent to be provided the first time user visits a website. Instead, the VPPA provides that "a video tape service provider may disclose personally identifiable information" "to any person with the informed, written consent ... ***of the consumer***." 18 U.S.C. § 2710(b)(2)(B). Under the VPPA, consent may be given either ***at the time disclosure*** is sought or given in ***<u>advance of disclosure</u>***, for a set period of time not to exceed ***2 years***. 18 U.S.C. § 2710(b)(2)(B)(ii)(I)–(II).

Here, consent was solicited from the "consumer" at the time of the pre-order game purchase—precisely when Plaintiff could have potentially first become a consumer under the VPPA. 18 U.S.C. §2710(a)(1) (defining a "customer" as a "renter, purchaser, or subscriber of goods or services from a video tape service provider"); *see also*, *Ubisoft*, 2025 WL 1036639, at *9. Before Plaintiff made the purchase alleged in the Complaint – a preorder of a game (Compl. ¶ 50) – Plaintiff was required to create an account, accept BNEA's Privacy Policy and Terms of Use, and consent to BNEA's data sharing practices. As explained in the Motion, Plaintiff was required to accept BNEA's Privacy Policy during the check-out

process to successfully pre-order a game. Motion at 10; Orozco Decl. ¶ 14, Ex. G to the Motion.

Challenging the BNEA's consent instruments under the temporal requirement of the VPPA, Plaintiff cites to *Ubisoft*. However, the holding in *Ubisoft* does not support Plaintiff's allegations. On the contrary, the court in *Ubisoft* analyzed identical claims and rejected them. *Ubisoft*, 2025 WL 1036639, at *9 ("Plaintiffs ignore that consent is elicited with each and every purchase on the Website[.]")

Plaintiff also improperly conflates the VPPA's consent requirement with the separate (and different) consent requirements under the California Invasion of Privacy Act ("CIPA"). *See* Opp. at 17 (citing *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *2 (9th Cir. May 31, 2022)). *Javier* addressed CIPA consent, not the VPPA. *See Javier*, 2022 WL 1744107 (holding that "California law requires 'prior consent of all parties to communication,'" in the context of wiretapping allegations).

Therefore, Plaintiff offers no authority to show that Plaintiffs' consent to use of cookies and pixels was not sufficient under the VPPA.

**B. BNEA Is Not a "Video Tape Service Provider"**

Regardless of consent, Plaintiff's claims still fail here as a matter of law because BNEA is not a video tape service provider for purposes of the VPPA. The VPPA defines "video tape service provider[s]," as entities "***engaged in the business***, in or affecting interstate or foreign commerce, of ***rental, sale, or delivery*** of ***prerecorded video cassette tapes*** or ***similar audio visual materials***." 18 U.S.C. § 2710(a)(4).

Plaintiff's claim that BNEA is a video tape service provider fails as a matter of law for two independent reasons: (1) video games are neither video cassette tapes, nor similar prerecorded audio visual materials; and (2) BNEA is neither substantially involved in the delivery of prerecorded video content nor is its

business model significantly tailored to the delivery of this type of content. As explained below, these factors simply do not apply to BNEA. Accordingly, Plaintiff's Complaint has not (and cannot) establish that video games are similar to video cassettes, nor can Plaintiff plausibly allege that BNEA is a video tape service provider, as that term is defined in the VPPA.

**1. Video Games Are Not Similar Audio Visual Materials**

The VPPA expressly defines "video tape service provider" as one engaged in the rental, sale, or delivery of "***prerecorded video cassette tapes*** or ***similar audio visual materials***." 18 U.S.C. § 2710(a)(4). This definition does not apply to BNEA, as it publishes and distributes video games – not video cassette tapes or similar audio visual materials.

Video games are a conceptually different type of entertainment from video cassette tapes. Video games are interactive media content, allowing players to control how the gameplay evolves. Indeed, video games are the *opposite* of prerecorded content. Video games are interactive experiences that involve user input, gameplay mechanics, decision-making, and often online participation—characteristics fundamentally unlike passive viewing. While some video games may contain a few cinematic cutscenes, such elements are not independently rented, sold, or delivered; rather, they are integrated components of an interactive product. As such, video games are not "similar" to the types of audiovisual content the VPPA was intended to cover.

Extending the VPPA to hold a "video game" is equivalent to a "video tape provider," as Plaintiff seeks to do here, would improperly stretch the statute beyond its plain text and legislative intent. The VPPA was enacted to regulate "a video tape service provider" that could rent or sell video tapes, like the old Blockbuster brick and mortar stores. Originally, Congress intended "similar audio visual materials" beyond video cassette tapes to cover other prerecorded video products like "laser discs, open-reel movies, and CDI technologies" – not video

games. *See* S. Rep. 100-599, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 4342; *see also*, *In re Nickelodeon Consumer Priv. Litig*., 827 F.3d 262, 290 (3rd Cir. 2016) ("Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim.")

Plaintiff's allegations here are simply too far afield from that "classic example" to state a claim. Indeed, the "classic example" of a VPPA violation "will always be a video clerk leaking an individual customer's ***video rental history***," which is what motivated Congress to pass the VPPA decades ago. *See In re Nickelodeon*, 827 F.3d at 290 (emphasis added). The VPPA was not designed to regulate the disclosure of data tied to interactive software or user-driven media, and courts have consistently cautioned against expanding the statute beyond its narrow scope, declining to this definition to live or interactive media. *See Stark v. Patreon, Inc*., 635 F.Supp.3d 841, 851 (N.D. Cal. 2022) (distinguishing prerecorded video content from live video content, holding that only the prerecorded video content falls within the scope of "similar audio visual materials").

To support its strained argument, Plaintiff relies on a single decision from a district court in New York, *Aldana v. GameStop, Inc*., 2024 WL 708589, at *6 (S.D.N.Y. Feb. 21, 2024). But Plaintiff misrepresents that court's holding, alleging the *Aldana* Court that found that a provider of any type of content can be deemed "video tape service provider." That is not what the *Aldana* court held. Instead, the *Aldana* Court found that "a video game is not just like a video," holding that to state a viable VPPA claim, a plaintiff should at least allege that the video game in question includes a "cut scene"—which is "prerecorded videos that the user can view in the context of playing an interactive game." *Aldana v. GameStop, Inc*., 2024 WL 708589, at *6 (S.D.N.Y. Feb. 21, 2024) (finding that Plaintiff's complaint adequately alleged that GameStop is engaged in the business of selling video games ***that include cut scenes***), *motion to certify appeal denied*, 2024 WL

3104345 (S.D.N.Y. June 24, 2024). Here, Plaintiff pled no facts supporting an assertion that BNEA is a "video tape service provider" even according to this standard from *Aldana*. *See generally* Compl. Regardless, the *Aldana* decision is not controlling on this Court and there is no basis for expanding the interpretation of the VPPA beyond the statutory text to cover any sellers of video games, which may include prerecorded videos that the user can view in the context of playing an interactive game.

Plaintiff also misrepresents the holding in *Mendoza v. Caesars Ent., Inc.*, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024). The *Mendoza* court rejected a complaint with the conclusory assertion – like in this Complaint – that an entity that offers "video content in the form of video games" to consumers is a "video tape service provider." The court held that this assertion was insufficient to establish that the defendant's website was covered by the VPPA. *Id*.

Plaintiff's claims similarly fail as a matter of law. The mere presence of a cutscene in BNEA's video games does not render BNEA a "video tape service provider." For this reason alone, the Complaint should be dismissed with prejudice.

**2. BNEA Is Not Substantially Involved In the Delivery Of Prerecorded Video Content**

Again, in order to be a "video tape service provider" under the VPPA a business must be "***engaged in the business***" of ***rental, sale, or delivery*** of prerecorded ***video cassette tapes*** or ***similar audio visual materials***." 18 U.S.C. § 2710(a)(4). Beyond video cassette tapes, Congress made it clear that it intended "similar audio visual materials" to cover similar prerecorded video products, like "laser discs, open-reel movies, or CDI technologies." *See* S. Rep. 100-599, at 12 (1988), reprinted in 1988 U.S.C.C.A.N. 4342. BNEA does not provide any such products to its customers.

Courts interpreting this statutory language have found that in order for a company to be deemed "***engaged in the business***" of delivering video content, its business model "must not only be ***substantially involved*** in the conveyance of video content to consumers but also ***significantly tailored*** to serve that purpose." *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (emphasis added). Plaintiff fails to (and cannot) plead that BNEA's business is ***substantially involved*** in the delivery of prerecorded video content nor that it is ***significantly tailored*** to serve that purpose, as courts have found the statute requires. Plaintiff cannot sufficiently do either because BNEA's business is publishing and developing interactive entertainment for use on major video game consoles, PC, online, and mobile platforms, not "the conveyance of video content."

Even assuming video games can be deemed similar to video cassettes – and they are not – Plaintiff cannot show that BNEA is "***engaged in the business***" of delivering prerecorded video content. Plaintiff only makes the unsupported (and erroneous) statement that "video games [are] interactive audiovisual entertainment products specifically tailored to deliver prerecorded video content." Opp. at 21. However, as discussed in the Motion, like in *General Mills*, BNEA does not derive its income making and selling prerecorded video materials. *Carroll v. Gen. Mills, Inc.*, 2023 WL 4361093, at *4 (C.D. Cal. June 26, 2023).

The statutory term "engaged in the business" of renting, selling, or delivering video content "connotes 'a particular field of endeavor,' i.e., a ***focus*** of the defendant's work." *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221 (citations omitted; emphasis added). Entities that are merely "***peripherally or passively*** involved in video content delivery do not fall within the statutory definition of a "video tape service provider." *Id*. (emphasis added). Thus, courts have held that "peripherally or passively" "hosting and creating" prerecorded videos, for instance, for marketing purposes, does not suffice to qualify an entity as a video tape service provider. *See Cantu v. Tapestry, Inc.*, 2023 WL 4440662, at *8 (S.D. Cal. 2023).

Instead, "[t]he plaintiff must sufficiently allege that the defendant's products are specifically tailored to serve audiovisual material." *Id.* (citation and internal quotation marks omitted). Here, Plaintiff cannot plead facts supporting any assertion that BNEA's products are specifically "tailored to serve audiovisual materials" because BNEA's products serve interactive entertainment in the form of video games.

The requirement that a defendant be "engaged in the business ... of rental, sale, or delivery" of video content is typically straightforward to apply in cases in which the defendant directly rents or sells prerecorded video content or access to such content over the internet. *See, e.g., Cappello v. Walmart, Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) (permitting claim against Walmart, a business that sold video media products through its website); *Cantu*, 2023 WL 4440662, at *8 (explaining that the type of sale at issue in *Cappello* is directly analogous to the ***conduct motivating the passage of the VPPA***); *Ambrose v. Bos. Globe Media Partners LLC*, 2022 WL 4329373, at *1-2 (D. Mass. Sept. 19, 2022) (permitting claim against the Boston Globe because it provided "hundreds, if not thousands, of videos" to users through its website in exchange for a paid digital subscription).

But BNEA's business is the delivery of ***video games***, not prerecorded videos like YouTube or Netflix. To allege otherwise would stretch the VPPA far beyond its statutory language and intended purpose – which courts have declined to do. *See Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 925 (C.D. Cal. 2023), aff'd, 132 F.4th 1110 (9th Cir. 2025) (declining to expand the definition of video tape service provider to a movie theater – "to say a movie theater "delivers" movies is to stretch the natural meaning of the verb beyond recognition"). Plaintiff has not – and cannot (for the reasons provided above) – allege that the focus of BNEA business is delivery of prerecorded videos, nor can Plaintiff allege that BNEA's business is ***tailored*** to the delivery of video content.

Therefore, even if Plaintiff were to allege that the incorporation of cutscenes into some of BNEA's products renders it a video tape service provider, such an allegation would be futile. Even a 1.5-hour compilation of prerecorded scenes from over 130-160 hours of gameplay cannot support a claim that BNEA's business model is specifically tailored to the provision of prerecorded video content, or that it qualifies as a video tape service provider. *See Tawam v. Feld Ent. Inc*., 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023) (Plaintiff alleged "Defendant's business involves increasing its brand presence via the use of 'videos' and 'monetizing videos'" – the court held "the allegations … concerning the volume and role of the video content at issue in this case do not support an inference that the videos viewed by Plaintiffs are more than peripheral to Defendant's business or that Defendant's website is significantly tailored to the purpose of conveying those videos"). For this independent reason, the Complaint should be dismissed with prejudice.

**C. Plaintiff Fails To Plausibly Allege the Disclosure of PII**

The Complaint should also be dismissed for the independent reason that BNEA did not disclose PII. As explained in the Motion, to plead a disclosure of PII under the VPPA, Plaintiffs must allege that BNEA disclosed: (i) "the consumer's identity; (ii) the video material's identity; and (iii) the connection between them." *In re Hulu Priv. Litig*., 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015); *see also Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015) ("information disclosed … must, at the very least, identify a ***particular*** person—not just an anonymous individual—and ***connect*** this particular person with his or her viewing history") (emphasis added).

This "connection" requirement—i.e., when the disclosed information "connects" a consumer to the video material the consumer requested or obtained triggering the VPPA violation—must "readily permit ***an ordinary person to***

***identify a specific individual's video-watching behavior***." *Eichenberger v.ESPN Inc*., 876 F.3d 979, 985 (9th Cir. 2017); *see also*, *Solomon*, 136 F.4th 41 (same).

Plaintiff unsuccessfully tries to distinguish *Solomon* and *Eichenberger*.

*First*, Plaintiff purports to differentiate the IDs at issue in *Eichenberger* from a Facebook ID, arguing that "[u]nlike the purely numerical device identifiers in *Eichenberger []* Facebook IDs are specifically designed to link users to their personal profiles containing identifying information[.]" Opp. at 23. In fact, the *Eichenberger* court analyzed an almost identical "purely numerical device identifier" – a Roku device serial number and the identity of the video that watched by user. Adobe then used that information to identify specific consumers by connecting that information "with existing data already in Adobe's profile of th[ose] individual[s]." *Eichenberger*, 876 F.3d at 981. The *Eichenberger* Court never analyzed the Facebook ID, nor did the court opine on whether a Facebook link or an email address would qualify as PII under the VPPA. *Id.* at 981 ("A Facebook link or an email address may very well readily enable an "ordinary person" to identify an individual. We need not and do not opine on the merits of those theories."). Furthermore, the Facebook ID is not the same as a "Facebook link" or an email address that were addressed in *Eichenberger*.

Plaintiff also contends that because his Facebook profile was created under his full name and can allegedly be accessed by appending the Facebook ID to "facebook.com," this information clearly identifies him without requiring any technical knowledge or code extraction. *See* Opp. at 23-24. However, this argument fails under *Solomon* – a case that "effectively shut the door for Pixel-based VPPA claims." *See Hughes v. Nat'l Football League*, 2025 WL 1720295, at *2 (2d Cir. June 20, 2025).

In *Solomon*, the court analyzed almost identical allegations – plaintiff alleged that her Facebook ID ("FID") and the titles of videos she streamed were disclosed to Facebook via the Pixel's "PageView." *Id*. at 45. The court rejected

the plaintiff's VPPA claim, holding that "it [was] not plausible that an ordinary person … would see the 'c_user' phrase" and readily identify it as "a person's FID." *Id*. at 54. The screenshots provided in the Complaint, Figures 1 and 2, intended to show the alleged transmission. Figure 1 is a screenshot allegedly to displaying the Pixel's "ViewContent" and showing the unannotated, dense URL. Figure 2, is a second screenshot displaying a long, encoded computer code, preceding the word "GET". Compl. p. 10

No ordinary person would be able to decipher the indistinguishable format of the "GET" request to filter out the actual Facebook ID from the surrounding code and symbols. The alleged FID here is the "sequence of numbers" "[un]labeled" and "embedded in many other lines of code." *Solomon*, 136 F.4th at 54. Compl. p. 10 (Figs. 1 & 2). The *Solomon* court explained in detail that it is "implausible that an ordinary person would understand" the name buried in heavily encoded text "to be a video title as opposed to any of the other combinations of words within the code." *Id*.

As illustrated on the screenshot below (provided in the Complaint on p. 10), the data format of the allegedly disclosed PII is far from "readily identifiable" standard. Compl. p. 10. (Figure 2).[3]

[3] The low resolution (and blurred) screenshot of the GET request that was initially provided in the Complaint (Compl. at p. 10. (Figure 2)) is copied below.

Mitchell Silberberg & Knupp LLP

▼ Request Headers

| | |
|---|---|
| :authority: | www.facebook.com |
| :method: | GET |
| :path: | /tr/?id=2331774727056582&ev=ViewContent&dl=https%3A%2F%2Fstore.bandainamcoent.com%2Fproduct%2Fdark-souls-iii-standard-edition-steam%2F&rl=&if=false&ts=1720552744508&cd[content_ids]=%5B%222424%22%5D&cd[content_type]=product_group&cd[value]=59.99&cd[currency]=USD&sw=1920&sh=1080&v=2.9.160&r=stable&a=plbigcommerce1.2&ec=0&o=4125&fbp=fb.1.1720486011102.648367800134116597&ler=empty&cdl=API_unavailable&it=1720552743354&coo=false&dpo=LDU&dpoco=0&dpost=0&eid=store-12-prd-us-central1-119324010290&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br, zstd |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | usida=eyJ2ZXIiOjEsImlkIjoiQXNnYnZwbjFrZ2NreG0iLCJ0aW1lIjoxNzIwNDgxMDk5fQ%3D%3D; datr=SXWMZis4cQUI8w6tFNUa8I3k; sb=NHeMZu_-Vtve32K8w28bt2ov; c_user=1778389[redacted] xs=25%3ADEvCRfLhJWyA1g%3A2%3A1720481625%3A-1%3A2252; fr=0nxB8EsH4iWrSBhK7.AWUPU9X8dSdKF7E8J9tddGi2oSo.BmjHc0..AAA.0.0.BmjHdb.AWUUlk6P_ks |
| Priority: | i |
| Referer: | https://store.bandainamcoent.com/ |
| Sec-Ch-Ua: | "Not/A)Brand";v="8", "Chromium";v="126", "Google Chrome";v="126" |
| Sec-Ch-Ua-Mobile: | ?0 |
| Sec-Ch-Ua-Platform: | "Windows" |
| Sec-Fetch-Dest: | image |
| Sec-Fetch-Mode: | no-cors |
| Sec-Fetch-Site: | cross-site |
| User-Agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.0.0 Safari/537.36 |

Finally, it does not matter whether Plaintiff's Facebook Profile contained his name because the standard is whether a user can understand the transmitted data. Courts, including the Ninth Circuit, have squarely rejected the notion that liability can rest on what a sophisticated third party like Facebook might infer using its own internal tools or data. *See Eichenberger*, 876 F.3d at 985 (the VPPA applies only where a disclosure "readily permit[s] an ***ordinary person*** to identify a specific individual's video-watching behavior") (emphasis added); *see also*, *Solomon*, 2025 WL 1256641, at *11 (same). Therefore, under both *Eichenberger* and *Solomon*, this GET request in the screenshot above, containing Facebook ID, fails the ordinary person test because no ordinary user would be able to "readily identify" a "specific individual's video-watching behavior" behind the string of numbers representing a GET request.

Mitchell Silberberg & Knupp LLP

## VI. CONCLUSION

As described above, and as also set forth in the Motion, Plaintiff's VPPA claims fail matter of law for three reasons. *First*, Plaintiff's claims are barred by his consent to the disclosed privacy policies of BNEA. *Second*, Plaintiff has not (and cannot) establish that BNEA is a "video tape service provider" within the meaning of the VPPA. This is because (i) video games are not akin to the "prerecorded audio-visual materials" contemplated by the VPPA, (ii) BNEA is not engaged in the business of delivering such materials. *Third*, Plaintiff failed to plausibly allege that BNEA disclosed his "personally identifiable information."

Plaintiff's Complaint fails to state a claim under the VPPA for each of these reasons, and any amendment would be futile. Accordingly, the Complaint should be dismissed with prejudice, and without leave to amend.

DATED: JULY 28, 2025 MITCHELL SILBERBERG & KNUPP LLP

By: */s/ Karin G. Pagnanelli*
Karin G. Pagnanelli
Lucy H. Plovnick (*pro hac vice*)

Attorneys for Defendant
Bandai Namco Entertainment America Inc.

**Certificate of Compliance-L.R.11-6.2.**

The undersigned, counsel of record for Bandai Namco Entertainment America Inc. that this brief contains 6,767 words, which complies with the word limit of L.R. 11-6.1.

DATED: JULY 28, 2025 *__/s/ Karin G. Pagnanelli__*